## Hookey Adoption Case.

Argued November 18, 1965. Before BELL, C. J., MUS-MANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

584

*Jack Brian,* with him *Richard, Brian & DiSanti,* for appellant.

*Harry J. Martin, Jr.,* for appellees.

OPINION BY MR. JUSTICE JONES, January 4, 1966:

These are consolidated appeals from companion adoption decrees[1] rendered by the Orphans' Court of Delaware County on April 28, 1965.

On April 9, 1965, Joan Hookey Carpenter (natural mother), the natural mother of the two children whose adoption is presently at issue, petitioned the Court of Common Pleas of Delaware County for a hearing to secure the custody of and/or visitation rights to her two children. The two children, aged nine and seven respectively, were at that time residing with their natural father, Edwin L. Hookey, Jr. (natural father), and his present wife, Catherine T. Hookey. Three days after the filing of the custody petition, the natural father—joined by his present wife—petitioned the Orphans' Court of Delaware County for the adoption of the two children.[2] After a hearing, President Judge VAN RODEN of the Orphans' Court granted decrees of

---

[1] A separate decree of adoption was properly entered in each case.

[2] Both the custody and adoption petitions, by agreement of counsel, were set down for hearing on the same date—April 26, 1965.

adoption of each child in favor of the natural father and his present wife. From these decrees, the natural mother has taken these appeals.[3]

The children's natural parents were married on February 11, 1956, and, of that marriage, three children were born; only two of these children are involved in these proceedings, Christine born in June, 1956 and Katherine, born February, 1958. In the wake of persistent marital discord, the natural mother left the matrimonial domicile on October 21, 1962, and this marital discord finally led to a divorce which terminated the marriage on April 19, 1963.

Immediately after the natural mother's withdrawal from the marital home in 1962, Madeline M. Kelly, *maternal* grandmother of the children, at the natural father's request, came to the marital home to take care of the children. Three weeks later, Mrs. Kelly, with the natural father's permission, took Christine to live with her at her own home and, shortly thereafter, the other child, Katherine, joined them. The two children remained in Mrs. Kelly's care for a period in excess of two years. For the major part of this time, the natural father financially supported the children and made regular biweekly visits to see them. During the same time, the natural mother failed to aid them financially, probably due to her own unemployment, but she did not see the children until the date of the hearing in this matter—April of 1965—a period of approximately 2½ years.

In May, 1963, the natural mother remarried. Of that marriage one child has been born and, at the time of hearing, a second child was expected. In May, 1964, the natural father remarried. Upon the natural father's remarriage, the two children left their grand-

---

[3] The collateral litigation, initiated for custody and/or visitation rights, resulted in an order dismissing the petition. From that order no appeal has been taken.

mother's home and moved into the residence occupied by the natural father and his wife and such was the custodial situation of these children when the adoption petitions were filed and the court decrees entered.

Having failed to obtain the natural mother's consent to the adoptions, the natural father relied upon an "abandonment" of the children by the natural mother to dispense with the necessity of her consent. The court below found there was sufficient evidence to sustain a finding of "abandonment"; it is this finding which the natural mother challenges on these appeals.

The Adoption Law of Pennsylvania (Act of April 4, 1925, P. L. 127, §2, as last amended by the Act of June 30, 1947, P. L. 1180, §2, 1 P.S. §2(c)) provides in pertinent part: ". . . The consent of a parent . . . *who has abandoned the child, for a period of at least six months, shall be unnecessary, provided such fact is proven to the satisfaction of the court or judge hearing the petition, in which case such court or judge shall so find as a fact; . . . .*" (Emphasis supplied). The statute specifically defines "abandonment" as "conduct on the part of a parent which evidences a settled purpose of relinquishing parental claim to the child and of refusing or failing to perform parental duties." (Act of 1947, supra, §1, as amended, 1 P.S. §1(a)). In *Smith Adoption Case,* 412 Pa. 501, 505, 194 A. 2d 919, Mr. Justice ROBERTS, speaking for this Court, aptly stated: "The parental obligation is a positive duty and requires affirmative performance which may not be delayed beyond the statutory period by the parent if the parental right is not to be forfeited." See also: *Maisels Adoption Case,* 395 Pa. 329, 149 A. 2d 38; *Hangartner Adoption Case,* 407 Pa. 601, 181 A. 2d 280.

The statute mandates a *finding* by the court of the fact of abandonment and, implicit in such mandate, is that the finding shall not be arbitrarily or capriciously made, that it shall be grounded on sufficient evi-

dentiary support and that it shall be made in full consonance with the legislative intent expressed in the statute (*Davies Adoption Case,* 353 Pa. 579, 46 A. 2d 252); it naturally follows that such finding is reviewable, both by a court en banc and at the appellate level, and the scope of review encompasses a scrutiny of the record to determine whether the finding of abandonment finds support in evidence sufficient both quantitatively and qualitatively: (*Schwab Adoption Case,* 355 Pa. 534, 537, 538, 50 A. 2d 504).

Our present inquiry is whether, upon the basis of the testimony on this record, the natural mother of these children has *abandoned* these children and has foregone her parental duties and relinquished her parental claims so as to justify, within the legislative intent, a judicial severance of all her rights as a natural parent of these children.

Without any justification other than a cessation of love for her husband, the natural mother of these children in October, 1962 "walked out" of the marriage home and forsook two of her three children. In explanation of her action, the natural mother stated that she could not take the children, they were too much for her, she only wanted Robert (the third child). Into the breach caused by the natural mother's departure and to take care of these two children, then only 6 and 4 years of age, very significantly the natural father called upon the natural mother's own mother and she took upon herself, with the natural father's aid, the care of these young children. By her own admissions, the natural mother made no attempt to see or to communicate with these children until after the summer of 1963 and the natural mother has no recollection, during this period, of having sent presents or other mementos to the children, although Mrs. Kelly, the maternal grandmother, recalled the receipt of a present for the children at Christmastime, 1962. It is most sig-

nificant of the attitude of the natural mother that from October, 1962—when she left the matrimonial domicile —until April, 1965—when the hearing took place— that the natural mother had not seen these children.

As to the events transpiring after the summer of 1963 the record is somewhat contradictory. The natural mother contends that attempts by her to see the children were thwarted by threats of the natural father to place the children in a "home" if she persisted in seeking to see the children. The natural father, in substance admitting such threats, maintained they were not indicative of that which he planned to do. Similarly, the natural mother contends that during this period she did send cards and other mementos to the children, a contention denied by the natural father.

Our study of this record reveals three facts as established beyond question: *first,* assuming the veracity of the recitation by the natural mother of attempts to see her children, no such attempts were made until after the summer of 1963, a period in excess of six months from the time the natural mother left the children in the matrimonial domicile; *second,* in April 1964, the natural mother voluntarily relinquished any rights to the custody of these children by not contesting the natural father's petition for the custody of the children and by signing a consent to such custody; *third,* from the time of the separation of the natural parents until May 1964—when the natural father remarried—the natural mother made no attempt to communicate with the natural father concerning the welfare and well-being of these children. It was not until the natural father's remarriage and the natural mother acquired knowledge of his plan to bring the children into the new home he was sharing with his new wife that the natural mother communicated with him concerning the possibility of seeing the children.

From our study of this record, we conclude there was sufficient evidence to sustain the finding of an abandonment. The natural mother very candidly admits that, from the time of separation in October of 1962 until sometime in the summer of 1963, she made no attempt whatsoever to see the children or to communicate with the natural father or the maternal grandmother concerning the well-being of the children. This period of time was in excess of the statutory time necessary to establish an abandonment. To abandon a child does not necessarily mean that the abandoning parent make any formal declaration to that effect, that she ignore entirely the child's existence, or that such parent entirely forego *any* interest in its welfare and its whereabouts; it means that the parent, by conduct, has acquiesced in a termination of that close relationship which normally exists between parent and child and in the assumption by others of complete parental rights and responsibilities: *Conlon's Adoption,* 53 Lack. Jur. 65; *Adoption of Toner,* 27 Leh. L.J. 88. Abandonment requires an intent to escape parental responsibility and conduct in effectuation of such intent and does not require that the parent cease to feel any concern for the child's interest: *Davies Adoption Case,* 353 Pa. 579, 46 A. 2d 252. The natural mother, by her failure to have anything to do with the children from October 1962 until, at the very minimum, the summer of 1963, certainly revealed a refusal on her part to accept any parental responsibility and a lack of even minimal parental interest in the children.

Once abandonment has been established and, *only then,* it becomes the duty of the court to determine whether the adoption of the child will be for the child's welfare and best interests. In the case at bar, the record indicates that these children are now living with their natural father and stepmother who stand ready and willing to provide them with the love, affection and

guidance which their best interests and welfare require. The court below saw and heard the parties and, by its decrees, determined that not only has the natural mother abandoned these children but that the adoptions would be in the best interest of these children. There is nothing on this record which would justify a finding that the adoptions would not enhance and assure the welfare of these children; the contrary is amply evident from this record.

Decrees affirmed. Each party to bear own costs.