354 A.2d 564

### In re ADOPTION OF M. T. T.

**Appeal of FATHER.**
Supreme Court of Pennsylvania.
Argued Jan. 22, 1976.
Decided March 17, 1976.

Legal Aid of Chester County, Robert L. Keogh, West-chester, for appellant.

Lamb, Windle & McErlane, Susan P. Windle, E. Craig Kalemjian, Westchester, for appellee, Chester County Children's Services.

Before JONES, C. J., and EAGEN, O'BRIEN, ROB-ERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

On January 22, 1975, the Orphans' Court Division of the Court of Common Pleas of Chester County entered a decree terminating appellant father's parental rights to his out-of-wedlock son. The orphans' court action was

taken pursuant to section 311(1) of the Adoption Act [1] (hereinafter "section 311(1)"), which authorizes termination of parental rights upon a finding of parental abandonment. On this appeal,[2] appellant argues: (1) the evidence is insufficient to support a finding of abandonment; and (2) the orphans' court erred in not directing the county child welfare agency to provide supportive services to appellant prior to seeking termination of appellant's parental rights. We agree with appellant's first contention and reverse.

The scope of our review is limited to determining from the record whether the hearing court's finding of abandonment is supported by competent evidence. *Sheaffer Appeal*, 452 Pa. 165, 305 A.2d 36 (1973); *Vaders Adoption Case*, 444 Pa. 428, 282 A.2d 359 (1971); *Hookey Adoption Case*, 419 Pa. 583, 215 A.2d 860 (1966); *Harvey Adoption Case*, 375 Pa. 1, 99 A.2d 276 (1953).

The facts are undisputed. Baby M was born on December 23, 1972. His parents, appellant, father (who was 19 years of age) and Sherry Tinson (who was 17 years of age), were not married and lived with their respective mothers. Appellant visited Tinson and his son frequently during the first two months of M's life. On several occasions, appellant and his mother took M to their house for periods ranging from a few hours to a day. However, primary parental responsibility remained

1. Act of July 24, 1970, P.L. 620, art. III, § 311(1), 1 P.S. § 311(1) (Supp.1975), which provides:
   "The rights of a parent in regard to a child may be terminated after a petition filed pursuant to section 312, and a hearing held pursuant to section 313, on the ground that:
   (1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties . . . .."

2. We hear this appeal pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(3), 17 P.S. § 211.202(3) (Supp.1975).

with Tinson, and appellant made only limited financial contributions for M's care.

On March 8, 1973, appellant was incarcerated on charges stemming from a burglary. He remained in contact with Tinson for the first several months of his imprisonment and often inquired about his son's welfare. Tinson requested that children's services place her and M in foster homes. On June 15 they were placed in separate foster homes and, shortly thereafter, Tinson terminated all contact with appellant. Appellant testified that he took steps to locate Tinson and his son, primarily through his mother, but without success.

Tinson decided to surrender M for adoption during the summer of 1973. In November 1973 Chester County Children's Services (hereinafter "children's services") (where M had been placed during the summer) petitioned for the termination of Tinson's parental rights and for custody of M in order that he might be adopted. Appellant was notified of the hearing by letter at the prison, and he immediately contacted the agency demanding custody of the child. According to testimony of a caseworker at the hearing, children's services determined that it was in M's best interests to postpone the voluntary termination of Tinson's parental rights until grounds could be established for involuntary termination of appellant's parental rights. To this end, as the record reveals, the agency decided to postpone the hearing hoping that appellant would not contact either Tinson or the agency for a six month period.[3] A letter was sent to ap-

3. M's caseworker testified as follows on cross-examination:
   Q. Had you ever talked to [appellant] yourself from the time that you took over as the caseworker on this case?
   A. Not until October 22 when he came in.
   Q. Of 1974?
   A. Yes.
   Q. So you never went out to the prison and talked to him?
   A. No.
   Q. You never explained to him anything about the six-month time limit and possible relinquishment; this has never been explained to [appellant] by you?

pellant informing him that the hearing had been "cancelled."

On January 23, 1974, appellant again contacted the agency and asked to be told his son's whereabouts. He also requested that he be informed of all future decisions concerning his son. These requests were ignored.

In early October 1974, children's services requested the court to reschedule the termination hearing. Later that month, appellant was placed in a work-release program and, for the first time since March 1973, was able personally to seek information concerning his son. Appellant requested a meeting with M's social worker, which occurred on October 22. Appellant stated that he wanted to raise M and requested that he be allowed visitation privileges and be informed of the location of the foster home. Children's services refused all of appellant's requests, claiming that its decision was based on Tinson's wishes. On December 11, 1974, appellant wrote a letter

A. Not by me, no.
Q. But you were aware then as of January, 1974, that [appellant] had in fact an interest in the child?
A. Yes.
Q. You stated when we were talking, when you were talking on direct examination about the dates of contact between January, 1974, and October, 1974, that you were on the lookout for communication from [appellant].
A. Yes.
Q. And the purpose of this was so that you would establish a six-month period, is that right?
A. Yes.
Q. As a matter of fact, you were hopeful that a six-month period would go by in which [appellant] would not contact you or make any contact with you?
A. Yes.
Q. So that a termination procedure would be possible at that time?
A. Yes.
Q. And the first time you talked to [appellant] was in October of 1974, is that right?
A. Yes.

. . . . . . . . .

Q. You don't consider it your duty to go to the father of the child for whom you are caring?
A. I want what is best for the child himself."

to children's services. He stated that, despite the earlier discouragement by the agency, he had attempted to find Tinson and M without success. He informed the agency that his efforts had been handicapped because of restrictions of the work-release program and renewed his request for assistance. Children's services, in a letter dated December 19, 1974, again denied his request.

On January 22, 1975, the termination hearing was held. The hearing court found that appellant had abandoned M because of his failure "to perform his parental rights toward M." [4]

A finding of abandonment pursuant to section 311(1) may be based on either of two grounds—that during a six month period either (1) the parent evidences a settled purpose of relinquishing parental claims to the child, or (2) the parent refuses or fails to perform parental duties. *McAhren Adoption Case*, 460 Pa. 63, 331 A.2d 419 (1975); *Appeal of Diane B.*, 456 Pa. 429, 321 A.2d 618 (1974).

This Court has recognized the seriousness of a finding of abandonment. In *Sarver Adoption Case*, 444 Pa. 507, 281 A.2d 890 (1971), we stated:

"The termination by the law of a natural parent's rights to his child on the grounds of abandonment is one of the most severe steps the court can take. The finality of the termination and the harsh connotations of a finding of 'abandonment' carry great emotional impact on both the child and the parent. For this reason, our law has been unwilling [to find abandon-

4. The Adoption Act, Act of July 24, 1970, P.L. 620, § 411(3), 1 P. S. § 411(3) (Supp.1975), provides that adoption may proceed without a putative father's consent. The orphans' court held that this provision is unconstitutional, relying on *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). See Pa.Constitution art. I § 28; *Adoption of Polaski*, 56 Erie Co.L.J. 55, 23 Fiduc.Rptr. 397 (1973). Appellee does not challenge this holding as it applies to appellant, and the issue was neither briefed nor argued before this Court. We therefore express no view on this issue. See *Wiegand v. Wiegand*, 461 Pa. 482, 337 A.2d 256 (1975).

ment] unless the record clearly warrants such a finding."

444 Pa. at 509–10, 281 A.2d 891; see *In re Fritz*, 460 Pa. 265, 333 A.2d 466 (1975); *McAhern Adoption Case*, 460 Pa. 63, 331 A.2d 419 (1975); *In re Adoption of R. I.*, 455 Pa. 29, 312 A.2d 601 (1973).

The orphans' court concluded that appellant had only a "sporadic" interest in M because the record disclosed only "isolated instances" when meager necessities were provided and statements of hope to raise M were made. It reasoned that this lack of interest was sufficient to support at least one of these grounds. We cannot agree.

The evidence is insufficient to support a finding that appellant demonstrated a "settled purpose" to relinquish M. In *McAhren* we stated that for such a finding the record must show an "affirmative indication of a positive intent" to abandon. 460 Pa. at 70, 331 A.2d at 422; see *Sheaffer Appeal*, 452 Pa. 165, 170, 305 A.2d 36, 39 (1973).[5]

Appellant, in his initial contacts with children's services, demonstrated his continuing interest in maintaining a parental relationship with his son and his desire to be informed of all legal proceedings involving his son. There is no evidence whatever that appellant changed his mind after writing this letter other than his failure to contact children's services for the following nine months. His uncontradicted testimony shows that he used the only means available to him (given children's

5. Cf. *Hunter Adoption Case*, 421 Pa. 287, 292, 218 A.2d 764, 767 (1966):

"In order to sustain such a finding, it must appear that the parent intended to give up the child absolutely, never to claim it again, and that this intention was manifested for a period of at least six months. . . . Therefore, any action on the part of appellant within this period inconsistent with 'a settled purpose' to relinquish [his or] her parental claim to the child would preclude a finding of abandonment."

See *Sarver Adoption Case*, 444 Pa. 507, 510, 281 A.2d 890, 891 (1971).

services' refusal to implement his requests) to locate either M or M's mother. Appellant, once he could make personal inquiries, made diligent efforts to locate his son. These factors demonstrate that appellant did not make "an affirmative indication of a positive intent" to abandon M. Rather, the record shows that he fully intended to exercise his parental rights as fully and as soon as possible. See *Sarver Adoption Case,* supra.

■■ Nor does the evidence support a finding that appellant failed to perform parental duties. Appellant was facing a crisis situation while in prison and had no means to care for or support his child. However, these circumstances alone cannot justify a finding of abandonment. *McCray Adoption Case,* 460 Pa. 210, 331 A.2d 652 (1975); *McAhren Adoption Case,* supra; *Appeal of Diane B.,* supra, 456 Pa. at 434, 321 A.2d at 620. Abandonment may be found only if appellant fails to use all available resources to preserve his parental relationship. As we stated in *McCray*:

> "[P]erformance [of parental duties] was made more difficult for this appellant as he was in prison and unable to support his family for most of the period under consideration. However, a parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness 'in declining to yield to obstacles' his other rights may be forfeited." (Footnotes and citations omitted.)

460 Pa. at 216, 331 A.2d at 655.

■ In *McCray* the incarcerated father could have located his daughter if he had attempted to do so. If he

had used reasonable efforts to contact her, he could have utilized his visitation rights and his personal counselors while in prison. This Court found that he had abandoned his child because he failed to make affirmative efforts to maintain his parent-child relationship. Here, on the other hand, the actions of children's services, which had custody of M, made it impossible for appellant to locate his son. He contacted that agency twice while in prison requesting help in maintaining his relationship with his son, and, in addition, he attempted to locate M through the efforts of his mother. The testimony of the staff of children's services demonstrates that it intended to frustrate all of appellant's efforts.[6] To fault appellant for failing to contact the agency before entering the work-release program despite the complete futility of such action would create an unduly harsh result. He "utilized those resources at his . . . command" while in prison and after entering the work-release program to retain his parental rights; these efforts are sufficient in the circumstances to preclude a finding of abandonment. See *McCray Adoption Case*, supra.

Appellant's second argument, that children's services has an affirmative duty to provide services to him so that he may be reunited with his son, was not raised in the orphans' court. We therefore do not consider it on

---

**6.** Applicable Department of Public Welfare regulations pertaining to adoption services provide in pertinent part:

Section 2–1–19: "Attention shall be given to rights of the child's father whether he is married to the child's mother or not. Such rights include, but are not limited to:
—notice of all proceedings or hearings;
—counseling."

Section 2–1–27: "The following services, if needed shall be made available to natural parents either directly or by referral:
—counseling;
—legal services;
—educational services;
—financial assistance;
—housing services."

Department of Public Welfare Regulations §§ 2–1–19, 2–1–27 (5 Pa.Bulletin 2199, August 23, 1975).

98

this appeal. *Sanders Appeal*, 454 Pa. 350, 353 n. 6, 312 A.2d 414, 416 n. 6 (1973); see *Dilliplaine v. Lehigh Valley Trust Company*, 457 Pa. 255, 322 A.2d 114 (1974).

Decree reversed; each party pay own costs.