387 A.2d 804

**In the Matter of the ADOPTION OF DAVID C.**

**Appeal of GERTRUDE U.**

Supreme Court of Pennsylvania.

Argued Sept. 21, 1976.

Decided April 28, 1978.

1

2

4

Jerome T. Foerster, Richard W. Cleckner, Harrisburg, for appellant.

James H. Cawley, Harrisburg, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION OF THE COURT

ROBERTS, Justice.

This is an appeal from a decree of the Orphans' Court Division of the Court of Common Pleas of Dauphin County denying appellant Gertrude U.'s petition for adoption of

David C., now twelve years old, because of its refusal to involuntarily terminate the parental rights of appellee, the natural father of David C.[1] Appellant challenges the sufficiency of the evidence to support the decree and contends the record does not support the orphans' court conclusion that involuntary termination of parental rights pursuant to section 311(1) of the Adoption Act[2] was not justified because the natural father had not "refused or failed to perform parental duties" or "evidenced a settled purpose of relinquishing parental claim." We agree with appellant and reverse the decree of the orphans' court.

## I

The scope of our review is limited to determining whether the decree of the orphans' court is supported by competent evidence. E. g., *In re: Involuntary Termination of Parental Rights of S.C.B. and K.T.,* 474 Pa. 615, 624, 379 A.2d 535, 539 (1977); *Adoption of M.T.T.,* 467 Pa. 88, 91, 354 A.2d 564, 566 (1976); *Shaeffer Appeal,* 452 Pa. 165, 169, 305 A.2d 36, 39 (1973). Even with this narrow scope of review, however, we conclude the decree of the orphans' court must be reversed because its determination that "no ground whatsoever upon which to base a decree of involuntary termination exists" is not supported by this record. To the contrary, appellant has established by uncontradicted evidence grounds justifying involuntary termination of appellee's parental rights. *In re Farabelli,* 460 Pa. 423, 333 A.2d 846 (1975).

## II

The basic facts are undisputed. Appellee married Starr M., the mother of David, on May 1, 1965, and lived with his

---

**1.** We hear this appeal pursuant to the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, art. II, § 202(3), 17 P.S. § 211.202(3) (Supp.1977).

This case was assigned to the writer on March 17, 1978, for the purpose of preparing an opinion expressing the views of a majority of this Court.

**2.** Adoption Act of July 24, 1970, P.L. 620, § 311, 1 P.S. § 311 (Supp.1977).

wife for one weekend in Harrisburg. He then went to Troy, New York, where he was employed, returning home at the end of the week to find his wife had left him. Subsequently he moved to Troy, New York. On December 10, 1965, David was born. In 1966, appellee moved to Toledo, Ohio. In August, 1967, appellee divorced his wife. Appellee remarried in 1969 and, in 1973, moved to Florida with his second wife and their daughter. David's mother died in May, 1973.

From the time of his birth, David lived with his mother in Harrisburg in a house owned and occupied by appellant, a friend of the mother. Appellant has at all times since the death of David's mother in 1973, supported David and has exercised custody, discipline and control over him in her home. In the summer of 1973, a court, following a full hearing, denied appellee custody of David and awarded custody to appellant, who at the time of the adoption hearing was a 58 year old woman employed with the Pennsylvania Association for the Blind for twenty-six consecutive years.

From December 10, 1965, until May 5, 1973, appellee visited David only once. That visit, lasting approximately ten minutes, occurred in the summer of 1967 when appellee was in Harrisburg in connection with his divorce proceedings. During this period, appellee sent his son no letters and sent birthday or Christmas cards or gifts only sporadically. During these seven and one-half years, appellee communicated with David's mother only twice concerning his desire to visit David.

From the death of David's mother on May 5, 1973, until the adoption hearing on November 1, 1974, appellee visited David only twice: once when attending the mother's funeral in May, 1973, and once in July, 1973, while pursuing custody of David. No visits were made in 1974. Appellee called David twice in December, 1973, but not at all in 1974. During 1973 and 1974, appellee wrote six letters to David and sent him Christmas and birthday cards.

Prior to April, 1973, although appellee was under a court order to support David, arrearages occurred in 1969, 1970,

1971 and 1972. From April, 1973, until November 1, 1974, the date of the adoption hearing, appellee paid no support. As the orphans' court found, appellee's income had ranged "from approximately $7,800 annually in 1966 to $13,000 annually at the time of the hearing" in 1974.

### III

There is no competent evidence supporting the orphans' court's finding that appellee affirmatively performed the essential parental duties of "care, control, love, protection, support, and subsistence." *Appeal of Diane B.,* 456 Pa. 429, 435, 321 A.2d 618, 621 (1974). Rather, there is abundant evidence to the contrary. While the orphans' court recognized that appellee visited David only three times in nine years and that he made almost no other efforts to communicate, the orphans' court nonetheless concluded that appellee "adequately performed what would be expected of him for purposes of preserving his right to object to an adoption of his child." This unsupported conclusion renders Section 311 of the 1970 Adoption Act a nullity and cannot stand.

Section 311(1) of the 1970 Adoption Act provides that parental rights may be terminated if:

"the parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties; . . . "

Because the section is written in the disjunctive, parental rights may be terminated if a parent *either* evidenced a settled purpose of relinquishing parental rights *or* the parent has refused or failed to perform parental duties. *In re Adoption of M.T.T.,* 467 Pa. 88, 354 A.2d 564 (1976).

Although this Court, in interpreting section 311(1), has recognized "that the measures taken by the parent to demonstrate his interest and affection must be viewed in light of the existing circumstances," *Adoption of R.I.,* 468 Pa. 287, 297 n. 10, 361 A.2d 294, 299 n. 10 (1976); *In re Adoption of McCray,* 460 Pa. 210, 216, 331 A.2d 652, 655 (1975), certain parental responsibilities must be satisfied.

8

As this Court stated in *In re: Involuntary Termination of Parental Rights of S.C.B. and K.T.,* supra:

"Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive and uninvolved interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. *In re Adoption of Orwick,* 464 Pa. 549, 347 A.2d 677 (1976); *In re Adoption of McCray,* 460 Pa. 210, 331 A.2d 652 (1975); *Appeal of Diane B.,* 456 Pa. 429, 321 A.2d 618 (1974); *In re Smith's Adoption,* 412 Pa. 501, 194 A.2d 919 (1963). This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. *In re Adoption of McCray,* supra; *Appeal of Diane B.,* supra; *In re Adoption of Jagodzinski,* 444 Pa. 511, 281 A.2d 868 (1971). Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.' *Appeal of Diane B.,* supra, 456 Pa. at 433, 321 A.2d at 620, quoting *In re: Adoption of J.R.F.,* 27 Somerset L.J. 298, 304–05 (Pa.C.P.1972)."

Id. 474 Pa. at 624, 379 A.2d at 540. Based on this record, it cannot be said that appellee took affirmative action to provide his son with the necessary "love, protection, guidance and support," all of which was being provided by appellant.

Appellee's failure to visit with his son is significant. From the time of David's birth to the adoption hearing, nine years later, appellee visited David only three times. Moreover, these visits, occurring at the time of appellee's divorce proceeding, the mother's death and the custody action, appear not to have been triggered by appellee's interest in his son, but rather by outside events necessitating travel to Harrisburg. One of these visits lasted only ten minutes. While the geographical distance separating appellee and

David might excuse the lack of frequent visits, it cannot justify the almost total absence of visits by appellee with his young son over a nine year period.

Appellee testified that he failed to take any affirmative action to visit David because: (1) the distance between Harrisburg and his residences in Troy, New York, Toledo, Ohio and Tampa, Florida were too great; (2) his former wife and appellant were hostile toward him; and (3) he did not know what to say to his son. The record reveals the following testimony by appellee:

"Q. Let me summarize then to see if I understand it. For the first two years when you lived in Troy, New York [a six-hour drive], your reasons for not visiting with the child was because he was too young, is that correct? Is that what you told us?

A. Yes, that is what I told you.

Q. Then [you] moved to Toledo [a nine-hour drive] and lived there for seven years and you didn't visit your son there. Now, what was the—

. . . . .

A. The fair statement would be I elected not to visit until the summer of last year.

Q. At which time the child at that time was almost eight years old?

A. Right.

. . . . .

Q. Then the last fifteen months your reason for not visiting with the child was you just started a new job?

A. No, my reason for not visiting is because I live over a thousand miles away and it is rather expensive, about one hundred ninety some dollars to get on a plane and come back. We have already gone through my financial situation. To drive up here takes two days. The reason I haven't come here since I moved to Florida is because I physically have been unable to from a time and financial standpoint."

■ A period of asserted hardship does not completely relieve a person of parental responsibilities. Compare *In re Adoption of M.T.T.,* supra, (imprisoned father utilized available resources thereby precluding involuntary termination of parental rights) with *Adoption of McCray,* 460 Pa. 210, 331 A.2d 652 (1975) (parental rights of imprisoned father terminated for failure to take advantage of available resources.) The pertinent inquiry is whether the parent has utilized those resources at his or her command in establishing a close relationship with the child. "Where the parent does not exercise reasonable firmness 'in declining to yield to obstacles' his other rights may be forfeited. See *In re: Adoption of J.R.F.,* 27 Somerset L.J. at 304." *Adoption of McCray,* supra, 460 Pa. at 217, 331 A.2d at 655.

In *In re: Adoption of J. R. F.,* 27 Somerset L.J. 298, 304 (Pa.C.P.1972) the court correctly stated:

"Since communication and association are essential to the performance of parental duty, the absent parent and his child are at a disadvantage; and if such a parent is to perform his parental duties, even to a more limited extent than when he lived with the family, he must make special effort to bridge the gulf of geographical separation and to take affirmative steps to maintain communication and association with his child. . . . "

Likewise, the court properly noted in *Termination of Parental Rights of J. R. M.,* 96 Dauphin 368, 371 (1974):

"However, the parent must remain cautious not to place himself voluntarily in a position that denies to him the full opportunities of being a parent he otherwise would have. If he does place himself in such a position, he has no cause to complain when his performance of parental duties is judged by a more demanding standard."

Thus appellee cannot excuse his failure to visit David more than three times in nine years by merely alleging that the distances between himself and the boy were too great and travel inconvenient.

The record is devoid of evidence that appellee used any other means "to take and maintain a place of importance in

the child's life." *Appeal of Diane B.,* supra, 456 Pa. at 433, 321 A.2d at 620, quoting *In re: Adoption of J. R. F.,* supra at 304–05. For the first seven and one-half years of David's life, appellee totally neglected his son. When his two letters to David's mother concerning visitation rights, sent in December, 1968, and May, 1969, went unanswered, appellee made no other affirmative efforts and instituted no legal proceedings to obtain visitation or custody rights. He testified that he did not visit because an attorney he once consulted advised him that a court probably would not award appellee custody or allow the child to visit appellee in appellee's home because of the child's tender years. Even if the attorney was right as to custody and extended visits with the child in appellee's home, the advice given in no way justifies appellee's refusal or failure to visit with David in Harrisburg. Writing two letters in nine years hardly constitutes the sort of effort that a parent who wants to maintain a place of importance in a child's life would make in order to ensure his ability to see the child and protect his parental rights.

Appellee made no attempt to compensate for his lack of visits by sending letters, calling David or making any other efforts. Appellee sent sporadic Christmas and birthday cards, but this action alone cannot support a finding that appellee actively performed his parental duties during David's first seven and one-half years.

Further, appellee, though under court order, failed to make any support payments after April, 1973, and allowed arrearages to occur in the four preceding years. Appellee testified that he ceased paying support because he was disappointed that custody of his son had been awarded to appellant. He also testified that, while he knew the payments were for the support of his son, he did not know he was required to continue making the payments after the mother's death because the payments were made to her. While a failure to provide support is not conclusive, it is a factor to be considered in determining whether the parent has forfeited parental rights. *Vaders Adoption Case,* 444

Pa. 428, 431, 282 A.2d 359, 360 (1971). Appellee's failure to support David, coupled with his failure to affirmatively act "to take and maintain a place of importance" in David's life, can only support the conclusion appellee has forfeited his parental rights.

## IV

Viewing the evidence in the light most favorable to appellee, it is clear that for approximately seven and one-half years, appellee manifested no genuine interest in his son and no concern for his care or well-being. Appellee failed to meet any of David's physical and emotional needs. By removing himself completely from the parent-child relationship, appellee permitted others, such as appellant, to provide David with necessary care and affection throughout the child's life. While we noted in *Wolfe Adoption Case,* 454 Pa. 550, 312 A.2d 793 (1973), that a parent need not always personally care for a child if the parent makes "reasonable arrangements" for the "temporary" care of the child, the present situation cannot reasonably be deemed "temporary." Nor can appellee be credited with making the arrangements for the care of his son. Appellee hardly could have demonstrated less interest in his son were he a total stranger. See *Smith Adoption Case,* 412 Pa. 501, 194 A.2d 919 (1963). Faced with similar situations, this Court has stated:

"Parental rights may not be preserved by complete indifference to the daily needs of a child or by merely waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities (while others adequately provide the child with her immediate and continuing physical and emotional needs). The parental obligation is a positive duty and requires affirmative performance which may not be delayed beyond the statutory period by the parent if the parental right is not to be forfeited."

Id. 412 Pa. at 505, 194 A.2d at 922.

Appellee also tried to explain away his failure to communicate with his son by elaborating upon the difficulties of

establishing a relationship with a young child. Appellee testified:

"You know, it is kind of difficult to write letters to a person that you don't really know that well, especially a child. What do you say to a child? Like I said, how do you call a kid when he is four or five years old when he seen you once when he was a year and a half, and say, 'Hello, I am your father.' I never called David because what do you say to a child? I didn't know him or see him except that one time when he was a year and a half old until his mother's death. Since then I have called him and written him. But even now it is difficult. What do you say to a child that you don't know that well, 'Hi, how are you, what are you doing?' What do you put in the letter?"

The fact is that parents do speak and communicate with young children. Here appellee chose to resolve his perceived problem by eliminating all efforts at communication. Appellee, who placed himself in a position which created his own unfamiliarity with his child, cannot now complain if the child, after a lapse of years, seems a stranger to him. Moreover, appellee appeared particularly well-equipped to communicate with his son had he desired to do so. At the same hearing in which he complained of his inability to communicate with David, appellee testified:

"Well, I wrote and produced and was the Bozo figure, Bozo the Clown, working with children doing a daily television program that was either an hour or half an hour

. . . .

. . . . .

The show was on television, but I would do many personal appearances working with children, going to various functions where they asked Bozo to go, working with retarded children which was rewarding personally, to be involved in helping them."

Appellant has clearly met her burden of establishing by a preponderance of the evidence that for a period of at least six months, appellee "has refused or failed to perform parental duties" within the meaning of section 311(1) of the

1970 Adoption Act. The orphans' court's contrary conclusion is not supported by competent evidence. The court correctly stated that "[t]he performance of parental duties cannot be determined simply and solely on a quantitative basis but must be measured additionally in light of what would be expected of an individual in circumstances in which the parent under examination finds himself." The court erred, however, in here interpreting this principle so broadly as to justify appellee's total failure "to love, to protect and to support [his] child." *Wischmann Adoption Case,* 428 Pa. 327, 331, 237 A.2d 205, 207 (1968). The orphans' court's erroneous interpretation would allow a parent to avoid the obligation of caring for children merely by voluntarily situating himself so that performance of well-recognized parental duties is inconvenient or requires the expenditure of some effort or money. Such an interpretation, never adopted by this Court, would defeat the strong Commonwealth policy requiring parents to affirmatively meet their parental responsibilities as mandated by the Legislature.

This case is not, as the orphans' court implies, one where the custodian of the child prevented the natural parent from performing the duties that otherwise would have been required. See *Vaders Adoption Case,* supra. While appellee contends that the hostility of appellant and the mother prevented more frequent contacts between him and his son, the only evidence he offered to support his contention was the mother's failure to respond to two letters concerning visitation written nine years earlier when David was three. There is no evidence appellant ever attempted to prevent contact between appellee and David. In fact, appellee testified he never had any calls to his son refused, he never was denied permission to visit with the child and he had no knowledge that his son did not receive any of the letters and cards sent. Appellee's testimony further revealed an absence of real hostility:

"Q. Isn't it a fact after your former wife's death that you came and stayed at the home of [appellant], were fed by her? Was there any hostility in that relationship?

A. Well, it may have been a subliminal hostility, but there wasn't anything overt, nothing obvious, nothing that was on the surface.

Q. But that was in May of 1973, right?

A. That is right.

Q. And yet you say that because of the hostility you felt—

A. Well, excuse me now. In July of '73 we came back. There was somewhat less of a cordiality than there was in May. But it wasn't extremely negative. I mean, there was still an amicability there. We stayed at a motel on the second visit, however."

The orphans' court erred in enunciating the standard that "[t]he most that could reasonably be expected in the way of performance of parental duties [by a parent who lives and works hundreds of miles from the residence of his son] would be the regular payment of support." To the contrary, this Court has consistently required the parent to take affirmative action to establish and maintain communication and association with the child. An absent parent must make special efforts to overcome the gaps created by geographic separation. Moreover, the record reveals that appellee missed several court-ordered support payments in the years prior to 1973 and failed to make any contribution towards his son's support subsequent to May, 1973. Appellee testified that he stopped paying support because (1) he was disappointed when the court did not award custody of David to him; (2) he felt it was not necessary to make a financial contribution; and (3) he did not understand he was required to continue paying support. This certainly does not justify eighteen consecutive months of non-payment. Over the years, appellee received legal advice concerning visitation, divorce and custody. Clearly, appellee had ample opportunity to obtain advice on the subject of his continuing obligation to support his young son.

Thus, appellee's failure or refusal to perform his parental duties did not result from circumstances beyond appellee's control. Rather, it resulted from appellee's failure to utilize

available resources to preserve the parental relationship. See *In re: Involuntary Termination of Parental Rights of S. C. B. and K. T.,* supra; *Adoption of McCray,* supra. The orphans' court's finding in favor of appellee is based upon an erroneous legal standard and is not supported by competent evidence.

 Moreover, during David's first seven and one-half years, there is no doubt appellee evidenced a settled purpose of relinquishing his parental rights. During that period, appellee performed no parental duties. This Court has held that "abandonment requires an intent to escape parental responsibility and conduct in effectuation of such intent and does not require that the parent cease to feel any concern for the child's interest." *Hookey Adoption Case,* 419 Pa. 583, 589, 215 A.2d 860, 863 (1966). The *Hookey* case, although decided prior to the enactment of the 1970 Adoption Act, remains valid with regard to what is recognized as performance of parental duties. See *Adoption of McCray,* supra, 460 Pa. at 217, 331 A.2d at 655 (Court applied *Hookey*-type abandonment analysis to support involuntary termination of parental rights under the 1970 Adoption Act.) In the eighteen months between the death of David's mother and the adoption hearing, appellee attempted some minimal effort at communication. In the first ten months of 1974, however, appellee paid no support, made no visits and made no phone calls. Appellee's efforts to communicate and associate with his son consisted solely of mailing four letters. Even if such conduct can ever suffice to preserve a parent's claim to a child, it definitely is insufficient here in light of the prior seven and one-half years of neglect. Furthermore, as this Court stated in *Adoption of McCray,* supra:

"[T]he courts have held that such a renewal of interest as in the instant case after the six-months' statutory period has passed will not revive parental rights toward that child. See *Smith Adoption Case,* 412 Pa. 501, 505, 194 A.2d 919, 922 (1963). Cf. *Harvey Adoption Case,* 375 Pa. 1, 99 A.2d 276 (1953). This Court indicated in *Davies Adoption Case,* 353 Pa. 579, 587, 46 A.2d 252, 256 (1976):

'Abandonment is not an ambulatory thing the legal effects of which a delinquent parent may dissipate at will by the expression of a desire for the return of the discarded child . . ..' "

Id. 460 Pa. at 217, 331 A.2d at 655–56. There is insufficient evidence to sustain the orphans' court's conclusion that appellant failed to prove by a preponderance of the evidence that appellee, for a six month period, evidenced a settled purpose of relinquishing his parental rights or refused or failed to perform his parental duties.

## V

Once we have determined that the statutory grounds for involuntary termination of parental rights have been proved, it is the child's welfare that is paramount. *Battle Adoption Case*, 456 Pa. 553, 558, 321 A.2d 622, 624 (1974). Appellee has not demonstrated a genuine desire to care and provide for his son. Although he instituted an action for custody in 1973, he ceased all contributions to support and made only minimal efforts to establish a relationship with David. Cf. *Battle Adoption Case*, supra (despite appellant's custody of the child for the two years preceding the adoption hearing, Court determined prior abandonment had not been terminated and that the child's welfare would best be served by affirming the adoption decree). In contrast, appellant has shown real concern and interest in David throughout his life. David has lived with appellant for all twelve years of his life and since the death of his mother appellant has performed all parental duties for David. She testified she has put aside $5,000.00 towards his higher education. There is no evidence that David has developed any ties or a sense of security with appellee, with whom he has never lived. This Court has recognized the problems created by uncertain living arrangements. See *In re: William L., Frank L., and Mark L., and Judith Denise B.*, 477 Pa. 322, 348, 383 A.2d 1228, 1241 (1977) ("Removal of the children from their foster homes, or inflicting upon them the fear that they might be removed at any time, could create

psychological and emotional distress . . . ."). This Court promotes David's welfare by permitting him to remain in a stable home and family. See *In re: William L., Frank L., and Mark L.,* supra (Court determined that because the children had been in foster care since 1971, disruption of the family already occurred and refused to consign the children to the limbo of foster care in order to preserve in law a relationship no longer existing in fact). A unanimous United States Supreme Court recently reached the same conclusion in *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 559, 54 L.Ed.2d 511 (1978). In upholding the state court's grant of an adoption petition over the objections of the father who had never lived with the child, the Court held:

> "Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child has never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except appellant."

This Court's determination today recognizes in law what in reality has been David's only home.

Accordingly, the decree of the orphans' court is vacated, and the matter remanded with directions to enter a decree terminating appellee's parental rights and granting appellant's petition for adoption. Each party to pay own costs.

JONES, former C. J., did not participate in the decision of this case.

NIX, J., did not participate in the consideration or decision of this case.

MANDERINO, J., filed a dissenting opinion.

MANDERINO, Justice, dissenting.

I dissent. As recently as February 28, 1977, this Court reiterated its recognition that because of the irreversible nature of an involuntary termination decree, and because of the severe emotional impact that such a decree might have

upon the parties, such action should be taken only when it is
" . . . clearly warranted by a preponderance of the
evidence." *Adoption of Baby Girl Fleming*, 471 Pa. 73, 76,
369 A.2d 1200, 1202 (1977). *See also, McAhren Adoption*, 460
Pa. 63, 331 A.2d 419 (1975); *Sarver Adoption*, 444 Pa. 507,
281 A.2d 890 (1971). The burden of proof has, until today,
always been on the party seeking the involuntary termina-
tion, *Adoption of Baby Girl Fleming, supra; Adoption of
McCray*, 460 Pa. 210, 331 A.2d 652 (1975), to establish by a
clear preponderance of the evidence that the parent whose
rights are sought to be terminated has either "refused or
failed to perform parental duties" or "evidenced a settled
purpose of relinquishing parental claim." Adoption Act of
July 24, 1970, P.L. 620 § 311, 1 P.S. § 311 (Supp.1977). The
majority today overturns, *sub silentio*, this long established
standard for assessing the sufficiency of the evidence in an
involuntary termination proceeding.

Furthermore, the majority misperceives and misstates this
Court's scope of review in a case such as this. The majority
states that our review in the instant case is " . . .
limited to determining whether the decree of the orphans'
court is supported by competent evidence." (at p. 5).
This statement is correct *only* when the orphans' court
decree has granted the petition for involuntary termination
of parental rights. As stated in *Adoption of M.T.T.*, 467 Pa.
88, 91, 354 A.2d 564, 566 (1976), a case relied upon by the
majority, our review,

> "is limited to determining from the record *whether the
> hearing court's finding of abandonment is supported by
> competent evidence. Sheaffer Appeal*, 452 Pa. 165, 305
> A.2d 36 (1973); *Vaders Adoption Case*, 444 Pa. 428, 282
> A.2d 359 (1971); *Hookey Adoption Case*, 419 Pa. 583, 215
> A.2d 860 (1966); *Harvey Adoption Case*, 375 Pa. 1, 99 A.2d
> 276 (1953)." (Emphasis added.)

Where, as here, the trial court has *refused* to grant the
involuntary termination petition, holding that the petitioner
has failed to sustain her burden of establishing either "re-
fusal or failure to perform" or "a settled purpose of relin-

quishing parental claim," we cannot reverse unless the record shows that the petitioner has met the burden of establishing these statutory prerequisites by a clear preponderance of the evidence. *Adoption of Baby Girl Fleming, supra; McAhren Adoption, supra; Sarver Adoption, supra.* Notwithstanding these cases, the majority states that the decree of the orphans' court must be reversed, and appellee's rights to his natural child terminated, because the refusal of orphans' court to terminate appellee's parental rights, "is not supported by the record" (at p. 5). This statement is but one of six which indicate the majority's erroneous perception of the law as to who bears the burden of proof in an involuntary termination case. Other such misstatements include:

"There is no competent evidence supporting the orphans' court's finding that appellee affirmatively performed the essential parental duties of 'care, control, love, protection, support and subsistence.' (Citation omitted.) (At 7).

. . . . .

Based on this record, it cannot be said that appellee took affirmative action to provide his son with the necessary 'love, protection, guidance and support,' all of which was being provided by appellant. (Citation omitted.) (at p. 8)

. . . . .

The record is devoid of evidence that appellee used any other means 'to take and maintain a place of importance in the child's life.' (Citations omitted.) (at p. 8)

. . . . .

Appellee clearly 'has refused or failed to perform parental duties' within the meaning of section 311(1) of the 1970 Adoption Act. The orphans' court's contrary conclusion is not supported by competent evidence. (Citation omitted.) (at pp. 13, 14)

. . . . .

There is insufficient evidence to sustain the orphans' court's conclusion that appellant failed to prove that appellee, for a six month period, evidenced a settled purpose of relinquishing his parental rights or refused or failed to perform his parental duties." (at p. 17)

It is true, as stated by the majority, that a parent has the affirmative duty to provide "love, protection, guidance and support" (at p. 8), we have never required the parent to bear the burden, in a termination hearing, of establishing such positive performance. Rather, the burden has rightly been placed, until today, upon the party seeking the involuntary termination, to prove by a clear preponderance of the evidence, that the natural parent has failed or refused to meet these affirmative obligations.

Appellant's adoption petition alleged, *inter alia*, that appellee had abandoned his rights to the child. The trial court concluded, after hearing, that appellant had failed to prove that at any time throughout the child's life appellant had demonstrated an intent to relinquish his parental claim. Appellant had argued, and introduced evidence in an effort to prove, that appellee had failed to support, visit, or communicate with the child. The court found to the contrary. Furthermore, the trial court found that there was no evidence to indicate the existence of any "incapacity, abuse, neglect or refusal" that could not or would not be remedied by appellant. My reading of the hearing transcript, and of the relevant statutory and case law confirms the correctness of the court's ruling.

As I noted earlier, the burden of proof is on the party seeking termination (appellant here) to establish either conduct for a period in excess of six months evidencing a settled purpose of relinquishing parental claim to a child or conduct indicating a refusal or failure to perform parental duties, which failure or refusal cannot or will not be remedied.

The record reveals the following. Since the child's birth in 1965 until the court awarded custody of the child to the appellant in 1973, support payments were made, as the trial court found, with "substantial regularity from 1966 until 1973." After 1973, appellee stopped paying support.

Failure to support, standing alone, however, is not conclusive of an intent to relinquish parental rights. *See e.g. Vaders Adoption Case,* 444 Pa. 428, 282 A.2d 359 (1971). Appellee testified that he stopped paying support after April 1973 because the support payments he had been making were made to the child's mother who was now dead. He stated that he then sought full custody and, having lost the custody suit, stopped paying support because the child was then living with appellant, whose income was much greater than his, and because no one told him he was supposed to continue making support payments. Although appellee may have been remiss in failing to provide any support at all for the period subsequent to April 1973, I do not think this alone evidences an intent to abandon the child. To the contrary, the testimony reveals that appellee fully intended to gain custody following his former wife's death and lost in his legal attempt to do so. Moreover, appellant admitted that she never sought any support payments from appellee.

Appellant also urges that appellee's record of visits and communications with the child evidences an intent to relinquish parental claims. In the nine years of the child's life the father visited him only three times, and communicated only with sporadic birthday and Christmas cards, letters, and telephone calls. *In Appeal of Diane B,* 456 Pa. 429, 321 A.2d 618 (1974), we held that a parent has a responsibility to provide care, control, and subsistence for his or her child, has a duty to love, protect, and support the child, and that this parental obligation was a positive duty requiring affirmative performance. The trial court in this case looked, properly I think, to the situation in which appellee found himself and concluded that under the circumstances, appellee's failure to take more frequent affirmative action was justified, *see Adoption of Farabelli,* 460 Pa. 423, 333 A.2d 846 (1975), and that therefore, appellant had failed to meet her burden of establishing abandonment on this ground.

In the instant case the child has lived in the Harrisburg, Pennsylvania area all of his life, while appellee has, because of his employment, been located in Troy, New York, Toledo,

Ohio, and is presently living in Tampa, Florida. The substantial distances involved, combined with appellee's modest annual income (ranging from $7,800 in 1966 to $13,000 at the time of the hearing) provide sufficient reason for the infrequency of appellee's visits. As to the lack of communication, appellee testified to the fact of his infrequent telephone calls and letters, saying:

"You know, it is kind of difficult to write letters to a person that you don't really know that well, especially a child. What do you say to a child? Like I said, how do you call a kid when he is four or five years old when he seen you once when he was a year and a half, and say, 'Hello, I am your father.' I never called David because what do you say to a child? I didn't know him or see him except that one time when he was a year and a half old until his mother's death. Since then I have called him and written him. But even now it is difficult. What do you say to a child that you don't know that well, 'Hi, how are you, what are you doing?' What do you put in the letter?"

Under the circumstances of this case, the trial court correctly concluded that appellant had not sustained her burden of clearly showing that appellee had either refused or failed to perform his parental duties or evidenced an intent to abandon his child. I would therefore affirm the decree of the orphans' court.