487 Pa. 99 (1979)
408 A.2d 1373
In re ADOPTION OF Y.S.
Appeal of D.J.S., Jr. and J.S.
Supreme Court of Pennsylvania.
Argued September 17, 1979.
Decided December 21, 1979.
*100 Gretchen Sohn Reed, Beaver, for appellant.
Edward J. Tocci, Duplaga, Tocci, Palmieri & McMillen, Aliquippa, for appellee.
Before EAGEN, C.J., and O'BRIEN, ROBERTS, NIX, MANDERINO, LARSEN and FLAHERTY, JJ.

OPINION OF THE COURT
FLAHERTY, Justice.
This is an appeal from a decree dated September 28, 1978 of the Orphans' Court Division of the Court of Common Pleas of Beaver County involuntarily terminating the parental rights of appellants, the natural parents of Y.S. This later decree reverses an earlier decree dated July 17, 1978 which upheld the parental rights of appellants in Y.S. We agree with the Orphans' Court decree and therefore, affirm.
Y.S. was born on June 9, 1974. In the early part of 1976, the appellants, the natural parents of Y.S., who lived in Ohio, separated because of marital difficulties. Y.S. continued to live with her mother who was employed. Then, in April of 1976, Y.S. was sent to live with her paternal grandparents in Cleveland, Ohio as Y.S.'s mother was encountering too many difficulties in working and trying to care for Y.S. The paternal grandparents had the natural parents sign a voluntary custody agreement for Y.S. The paternal grandparents then delivered Y.S. to appellees, Mr. and Mrs. H. on April 16, 1976, who resided in Beaver County, Pennsylvania. The transfer to the appellees initially was not for the purpose of adoption. From April 16, 1976 until the latter part of July, 1976, Y.S. resided primarily with appellees. There were ten occasions when Y.S. was returned to the paternal grandparents in Cleveland. On each visit, Y.S. stayed with her grandparents for only a "few *101 days". Each time Y.S. was returned to appellees. In July of 1976, the appellees informed the grandparents that these arrangements could no longer persist, and that appellees must either be allowed to adopt Y.S. or they would return her to the grandparents.
As a result, the appellants and the paternal grandparents met with appellees in appellees' attorney's office in Beaver County on August 3, 1976. There, appellants signed a voluntary written consent to Y.S.'s adoption. Later in August, 1976, appellants contacted counsel in Ohio who informed appellees' counsel that appellants were withdrawing their consent, and wanted Y.S. returned to them. When appellees were informed of appellants' change of attitude, they refused to return Y.S.
Appellees provided all the material necessities of life to Y. S. since April 16, 1976. Appellants have not provided any necessities of life to Y.S. during this period. Appellants also have not seen, called, or written to Y.S. from the first week of July, 1976 through the date of the involuntary termination hearing on July 12, 1977.
Appellants assert that the lower court erred because there was insufficient evidence to support the involuntary termination of their parental rights. We disagree with appellants' position. Section 311(1) of the Adoption Act[1] states in relevant part:
The rights of a parent to a child may be terminated after a petition pursuant to section 312 and a hearing held pursuant to Section 313, on the ground that:
(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties . . . (emphasis added) 1 P.S. § 311(1).
It is clear from the record that appellants have refused or failed to perform their parental duties for a period of more *102 than six months. The Matter of Adoption of David C., 479 Pa. 1, 5, 387 A.2d 804, 809 (1978) sets out this Court's scope of review, which is, "[L]imited to determining whether the decree of Orphans' Court is supported by competent evidence." Matter of Adoption of David C., 479 Pa. at 5, 387 A.2d at 813.
During the period of April 16, 1976 to July, 1977 when Y. S. was in appellees' custody and care, she was returned for several visits requested by her paternal grandparents. The excuse that was given was that appellants wanted to see their child, but there is nothing in the record to indicate that appellants visited Y.S. while she was at her paternal grandparents' house in Cleveland. Appellees then would drive Y. S. back from Pennsylvania to the paternal grandparents' house in Cleveland. These visits were only for a few days, and then Y.S. would be returned to appellees. Once the voluntary adoption petition was signed by appellants on August 3, 1976, the requests for the return of Y.S. stopped completely. During the entire period from the end of July, 1976 to July 12, 1977 and afterwards, appellants had no contact with their daughter. The appellants did not telephone Y.S., send her birthday or Christmas cards, and did not visit her. No financial support was given to Y.S. by appellants during that period. Appellants also did not inquire about Y.S.'s well-being. Litigation was the only active conduct that appellants pursued to maintain their parental rights. The Matter of Adoption of David C., 479 Pa. at 8, 387 A.2d at 814, had held that, "[P]arental obligation [is] a positive duty which requir[es] affirmative performance." In Re Burns, 474 Pa. 615, 624, 379 A.2d 535, 540 (1977) states that, "[p]arental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance and support. These needs, physical and emotional, cannot be met by a merely passive [and uninvolved] interest in the development of the child." In Re Burns, 474 Pa. at 624, 379 A.2d 535. There has been no active interest taken by appellants, as evidenced by the record, in the physical and emotional well-being of Y.S. The only active *103 role appellants have taken has been litigation which is no replacement for love, protection, care, and guidance. The same standard was reiterated in the Matter of Adoption of David C., 479 Pa. at 15, 387 A.2d 804 where the Court noted that it was the parents' obligation to affirmatively maintain communication with the child.
Appellants claimed their parental obligation was fulfilled by paying money to Y.S.'s paternal grandfather for her support, but this is not enough. The parental affirmative duty involves more than a financial obligation, it requires a continuing interest in the child, and a real effort to maintain communication and association with the child. Matter of Adoption of David C., 479 Pa. at 9, 387 A.2d 804. Appellants never communicated with Y.S. or visited her. The money that appellants said they gave never reached appellees who were caring for Y.S. Appellants never inquired whether this money ever reached appellees even though appellants knew where appellees were living.
The appellants' lack of interest and concern for their daughter is shown in their testimony. After carefully reviewing the record, we find ample evidence to support the following statements of the lower court judge about appellant, the natural father of Y.S.'s testimony.
I get the distinct impression from his [appellant natural father's] manner of testifying, his manner and attitude here in the Court Room and on the witness stand, that he doesn't really care whether he knows the answers or not. If he doesn't know, he will say whatever comes to his mind. . . . He [appellant natural father] is throwing a lot of dust in here. . . . (R107a)
The appellant, the natural father of Y.S. testified that Y. S. had been with her grandparents for the period of April, 1976 to August 3, 1976. He also testified that he had visited Y.S. three days a week while she was at her grandparents' house. It is obvious from the record that the child was with appellees in Pennsylvania for that same period.
*104 The appellant, the natural father of Y.S. showed little concern about whether their child was in Pennsylvania as the following testimony indicates:
Q: Did you ever stop by their [appellees Mr. and Mrs. H.'s] home?
A: No.
Q: You didn't really know them at all? You only saw them the one time in Cleveland?
A: Right.
Q: For how long?
A: About an hour.
Q: You don't know anything about them?
A: No.
Q: Yet you were willing to deliver the child to them for them to take care of her and keep the child?
A: Right.
Q: You knew nothing about them, their home, their background, any children they may have had, whether they were drug addicts; you knew nothing about them? Is that right?
A: That's right.
Q: You were aware of the fact that they were going to be here in Pennsylvania with the child?
A: Right.
Q: And knowing all that you were willing to do that?
A: Yes. . . . (R97a)
Even after the appellants learned their daughter was living in Pennsylvania they did not show any interest in her, and, in fact, the appellant, the natural mother of Y.S., never had any contact with the child as of July 12, 1977, as the following testimony would disclose:
Q: Did you sign any paper since June when your lawyer made an oral motion for a habeas corpus hearing to have your child returned to you?
A: Not that I can recall.

*105 Q: Have you ever called Hosch's [appellees] and made any inquiry about how the child was coming along?
A: No.
Q: Did you ever send any gifts to the child?
A: No.
Q: Any money to the Hosch's house?
A: No.
Q: Any clothes?
A: No.
Q: Have you made any inquiry whatever about the welfare of this child?
A: Not that I can recall. . . . (R64a)
Appellants assert the reason they did not attempt contacting Y.S. during the period from August 3, 1976 to July 12, 1977 was on the advice of counsel. In the Matter of Adoption of David C., 479 Pa. at 11, 387 A.2d 804, the Court suggests that attorney's advice is not sufficient justification for refusal or failure to visit a child, and we here, on this record, so hold. The appellants thus, have lost all claim to Y.S. by their conduct towards her.
Accordingly, the decree of Orphans' Court involuntarily terminating the parental rights of appellants, is affirmed.
Decree affirmed. Each party to pay own costs.
MANDERINO, J., did not participate in the decision of this case.
NIX, J., filed a concurring opinion.
NIX, Justice, concurring.
I cannot join an opinion where the majority has announced the novel and frightening principle that a natural parent may jeopardize his or her parental rights by acting in accordance with the instructions of counsel who has been retained specifically to assist the parent in defending against a suit for the involuntary termination of parental rights. The majority, at page 1376, makes the following statements:

*106 Appellants assert the reason they did not attempt contacting Y.S. during the period from August 3, 1976 to July 12, 1977 was on the advice of counsel. In the Matter of Adoption of David C., 479 Pa. at 11, 387 A.2d 804, the Court suggests that attorney's advice is not sufficient justification for refusal or failure to visit a child, and we here on this record, so hold. (Emphasis added).
The reliance on the language in the Matter of Adoption of David C., supra, is completely misplaced.[1] In that case, the Court merely stated that the fact that an attorney, whose relationship with the appellant therein was not defined, had advised the father that he would probably not be awarded custody or the right to extended visitation privileges did not preclude the father from attempting to remain in communication with the child. In the Matter of the Adoption of David C., supra, there was not a specific direction not to attempt to communicate with the child as was the case here. To infer from the parent's compliance with counsel's advice an abandonment or neglect is not only logically unsound, but it also dangerously undermines the relationship between client and counsel.
I do agree that the record established other conduct which would justify the termination of parental rights. I, therefore, concur in the result.
NOTES
[1] Adoption Act of July 24, 1970, P.L. 620 § 311, 1 P.S. § 311 (Supp. 1977).
[1] The portion of the opinion in question states:

For the first seven and one-half years of David's life, appellee totally neglected his son. When his two letters to David's mother concerning visitation rights, sent in December, 1968, and May, 1969, went unanswered, appellee made no other affirmative efforts and instituted no legal proceedings to obtain visitation or custody rights. He testified that he did not visit because an attorney he once consulted advised him that a court probably would not award appellee custody or allow the child to visit appellee in appellee's home because of the child's tender years. Even if the attorney was right as to custody and extended visits with the child in appellee's home, the advice given in no way justifies appellee's refusal or failure to visit with David in Harrisburg. Writing two letters in nine years hardly constitutes the sort of effort that a parent who wants to maintain a place of importance in a child's life would make in order to ensure his ability to see the child and protect his parental rights.
Matter of Adoption of David C., 479 Pa. at 11, 387 A.2d at 808-809 (emphasis added).