**[J-74A-2021 and J-74B-2021]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: L.A.K. | : | No. 14 WAP 2021 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: C.K. | : | Superior Court entered March 26, |
| | : | 2021 at No. 962 WDA 2020, |
| | : | reversing the Order of the Court of |
| | : | Common Pleas of Westmoreland |
| | : | County entered August 27, 2020 at |
| | : | No. 113 of 2019, and remanding |
| | : | |
| | : | ARGUED:  October 27, 2021 |
| | | |
| IN RE: ADOPTION OF: A.L.K. | : | No. 15 WAP 2021 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: C.K. | : | Superior Court entered March 26, |
| | : | 2021 at No. 963 WDA 2020, |
| | : | reversing the Order of the Court of |
| | : | Common Pleas of Westmoreland |
| | : | County entered August 27, 2020 at |
| | : | No. 114 of 2019, and remanding |
| | : | |
| | : | ARGUED:  October 27, 2021 |

**OPINION**

**JUSTICE DONOHUE**                    **DECIDED:  DECEMBER 23, 2021**

Pennsylvania's Adoption Act, 23 Pa.C.S, §§ 2101-2938, authorizes the involuntary

termination of parental rights in certain enumerated circumstances.  Section 2511(a)(1)

of the Adoption Act permits the termination of parental rights upon establishing parental

abandonment. 23 Pa.C.S. § 2511(a)(1).[1] In this case, the trial court denied a petition seeking the termination of parental rights based on Section 2511(a)(1) and (2)[2] and the Superior Court reversed with respect to Section 2511(a)(1). In this discretionary appeal, we consider whether the Superior Court erred in its review of the trial court's determination. We further consider whether evidence of a parent's efforts to achieve sobriety can defeat a claim of parental abandonment. We recognize that alcohol addiction can present a barrier to fulfilling parental obligations and as such, the determination of whether efforts to overcome the barrier are sufficient to overcome a finding of parental abandonment under Section 2511(a)(1) of the Adoption Act is a fact-specific determination that rests within the discretion of the trial court. Because the Superior Court exceeded its scope of review in this case, we reverse its determination

---

[1] As discussed in more detail *infra*, parental abandonment is found upon proof that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1).

[2] 2511(a)(2) provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> *      *      *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

and remand the case to the Superior Court with instructions to reinstate the order of the trial court.

## I. Background

C.K. ("Father") is an alcoholic. By the age of thirteen, he was drinking to the point of blacking out. N.T., 7/22/2020, at 67. His uncontrollable drinking continued through his early adulthood and his marriage to A.G. ('Mother"), with whom he shares two children. *Id.* at 68. Largely as a result of Father's alcoholism, Mother and Father separated in 2015 and divorced in 2017. *Id.* at 8. At the time Mother and Father separated, L.A.K. was three years old and A.L.K. was seven months old. *Id.* at 9. Following separation, Mother retained custody of the children. Father last saw the children in January 2016. *Id.* at 10. In March 2016, a custody order was entered, providing Father with supervised visitation with the children in the presence of a therapist, for which he had to bear the cost. Father never exercised his rights under this order. He testified that he could not afford to pay for the visitation sessions and he did not want the children to see him grappling with his addiction. *Id.* at 103-04; Trial Court Opinion, 10/23/2020, at 3. Mother candidly testified at the trial that it was best for the children that Father was not involved in their lives while he was in the depths of his addiction N.T., 7/22/2020, at 28.

Mother does not dispute the severity of Father's alcoholism. She was aware of Father's struggles with alcohol prior to their marriage and testified that it was "a good thing" that Father did not have contact with the children while he was struggling to become sober. *Id.* at 27-28. Between the date the parties separated in 2015 and October 2018, Father's alcoholism controlled his life. His mother ("Paternal Grandmother") permitted Father to live in her home for a time, but she eventually kicked him out because of his

drinking and the physical destruction to her house that he caused when drinking. *Id.* at 139-40. During that time, he lost his driver's license and nursing license and experienced periods of homelessness and unemployment. Father attended two inpatient treatment centers and at least five detoxification programs. Father's last hospitalization for alcohol-related issues occurred in October 2018. This was, according to Father, when he hit "rock bottom." *Id.* at 75, 80. At that time, Father's withdrawal symptoms, including seizures and hallucinations, intensified and were more severe than they had ever been. *Id.* at 80.

Upon his discharge from that hospitalization in October 2018, Father attended ninety Alcoholics Anonymous meetings in ninety days, and at the time of the termination hearing in July 2020, Father estimated that he had attended more than 500 meetings. Father also attended Celebrate Recovery for a period of time, a program similar to Alcoholics Anonymous also aimed at maintaining sobriety. In his previous attempts at sobriety, Father would take on "too much, too fast," which would lead to a relapse within a period of months. *Id.* at 87, 121. Because he did not want to risk traumatizing the children by coming in and out of their lives, he decided to wait until he achieved a year of sobriety before making contact with them. *Id.* at 87. Father conceived the idea to wait for a year of sobriety from his familiarity with the Alcoholics Anonymous program, as it frequently uses a year of sobriety as a benchmark for resuming various activities, such as dating. *Id.* Once he obtained a full year of sobriety, Father "was confident enough that [he] could keep it and move forward with seeing [his] children at that point." *Id.* at 87-88. On October 23, 2019, a few days after marking a year of sobriety, Father filed his petition seeking to modify the custody order. *Id.* at 94-95. As a result of this filing, a custody conciliation was scheduled for December 19, 2019.

Mother and Stepfather (sometimes collectively referred to as "Appellees) have lived with the children, as well as Stepfather's son from a previous relationship, since 2017. *Id.* at 17. Mother and Stepfather married in the summer of 2019, and in furtherance of their efforts to blend their families, they decided that Stepfather would adopt L.A.K. and A.L.K. and Mother would adopt Stepfather's son. *Id.* at 20. Following Mother's separation from Father, Mother allowed Paternal Grandmother to regularly spend time with the children in Paternal Grandmother's home. Typically, Paternal Grandmother would pick the children up from daycare and keep them until Mother finished work or otherwise have the children spend the night in her home. *Id.* at 28-29, 144. Shortly before ending all contact, in September 2019, Mother conditioned Paternal Grandmother's time with the children on the agreement that she would not discuss the children with Father or share photographs and videos of the children with Father. *Id.* at 147-48. Mother ceased all contact between Paternal Grandmother and the children in October 2019. *Id.* at 30-31.

On October 31, 2019, Mother and Stepfather filed petitions seeking to terminate Father's parental rights alleging both parental abandonment and parental incapacity on Father's part. Although filed only days apart, Mother and Stepfather deny that they filed these petitions in response to Father's request to modify the custody order.[3] *Id.* at 57. At

---

[3] Although Mother and Stepfather filed the petitions to terminate Father's parental rights one week after Father filed a petition to modify the custody order, our decision in this case is not influenced in any respect by this Court's admonition against gamesmanship in *In re Adoption of M.R.D.*, 145 A.3d 1117, 1129 (Pa. 2016). Father has not alleged that any gamesmanship took place and Mother testified regarding the coincidental nature of the filings just one week apart. N.T., 7/22/2020, at 20, 56-57. Moreover, unlike the facts presented in *M.R.D.*, where the unmarried mother who petitioned for the termination of father's parental rights, sought to retain her parental rights, and the prospective adoptive parent was the children's maternal grandfather, i.e., the mother's father, *M.R.D.*, 145 A.3d at 1118, this case presents no clear indicia of a misuse of adoption proceedings. This

the hearing in this matter, Mother and Stepfather explained that they first discussed the process to terminate Father's parental rights with counsel in August 2019, and they attribute the delay in filing to their busy summer schedule and the time and effort it took to locate all of the information needed. *Id.* at 20, 56-57. Notwithstanding the filing of the termination petitions, the previously scheduled custody conciliation occurred in December 2019 and resulted in an order providing for reunification therapy between Father and the children. The order further provided, however, that the implementation of the reunification efforts would be stayed until the adjudication of the petitions to terminate Father's parental rights. *See* Trial Court Order, 12/18/2019, at 3.

The hearing on the termination petitions occurred in July 2020, at which Mother, Father, Stepfather and Paternal Grandmother testified to the circumstances described above. Also relevant for our purposes, Mother testified that A.K. does not know who Father is and that L.A.K. only has a "brief recollection" of Father. *Id.* at 22. Mother believes that the children are physically and mentally healthy and well-adjusted, and that it would be detrimental to their emotional stability for Father to be reintroduced into their lives. *Id.* at 23-24. Mother explained that the children "have grown comfortable and really bonded with us as a family" and that she was "concerned about how it would affect them and their relationship with [Stepfather], their relationship with me" if a relationship with Father were reestablished. *Id.* at 24. Mother harbors some fear for the children's physical safety with Father, as in the past she would return home to find Father passed out and

case instead involves a traditional stepparent adoption and there is no evidence that the termination petitions were filed as a pretext to remove the case from the custody court. Indeed, the custody proceeding continued in tandem with the termination proceeding and the trial court relied on the procedures put in place by the custody court as a backstop for its conclusions.

the children crying. *Id.* Mother denied ever witnessing anything that would suggest that either child has a bond with Father. She believes that termination of Father's rights would be in the children's best interests. *Id.* at 24-25. Stepfather testified that L.A.K. has occasionally expressed memories of "old dad" and asked where "old dad" is. *Id.* at 58. Stepfather believes that he and the children share a bond and that reintroducing Father to the children would cause them anxiety and confusion. *Id.* at 59. He, like Mother, believes that terminating Father's rights would serve the children's best interests. *Id.* at 60. Legal counsel for the children testified that he met with the children for approximately one hour, during which time he asked the children questions about their family. *Id.* at 151. During the interview, A.K. gave no indication that she knew who Father was. *Id.* at 152. After some prompting, L.A.K. identified Father as "old dad," although he could not recall when he last saw him. *Id.* The guardian ad litem acknowledged Father's sobriety but questioned his commitment to it. *Id.* at 154-57. She further expressed her belief that the children are in a "stable situation," that Father's desire to reestablish contact at this juncture of his life is selfish, and that termination of his parental rights would be in the children's best interest. *Id.* at 158-59.

After hearing the evidence as presented, the trial court ultimately denied the petitions, concluding that Appellees failed to establish that termination of Father's parental rights was warranted by clear and convincing evidence under any of the relevant statutory provisions. The trial court recognized that while termination is appropriate under Section 2511(a)(1) when a parent has not maintained contact with a child for a period of six months prior to the filing of the termination petition, the court also had to consider any barriers to contact that the parent faced and the parent's efforts to overcome any such

barriers. Trial Court Opinion, 10/23/2020, at 4-5. While the trial court found that Appellees presented evidence sufficient to establish that Father had not seen the children in years, "his act of distancing himself … was done with an eye towards what was in their best interest." *Id.* at 5. The trial court found that Father "continued to work on improving himself to the point where he had a handle on his sobriety" before reaching out to the children. *Id.* at 3. The trial court acknowledged Father's repeated enrollments in rehabilitation facilities between 2015 and 2018 and concluded that once Father obtained sobriety, "he has worked diligently to maintain it[,]" through dedication to Alcoholics Anonymous meetings, the continual use of coping skills learned in those meetings, and his commitment to exercising or working extra shifts to "keep himself focused on things other than alcohol." *Id.* at 3-4.

> Even though Father was not present to perform traditional parental duties, he testified that rebuilding a relationship with his children was the main motivating factor in his quest to obtain sobriety. As of the date of the hearing, Father was reportedly paying $600.00 per month in child support to Mother. Father was able to maintain contact with the children via Paternal Grandmother [] until Mother forbade her from sharing any pertinent information with Father in September 2019. Shortly after this change in circumstance, Father petitioned the court for modification of custody and attempted to make contact with the children himself. For these reasons, the [c]ourt found that [Appellees] failed to meet their burden under Section 2511(a)(1).

*Id.* at 5.

The trial court engaged a similar logic with respect to Section 2511(a)(2), which provides for the termination of parental rights where the continued incapacity, abuse, neglect or refusal of a parent has caused a child to be without essential parental care, control or subsistence, and the cause of the incapacity, abuse, neglect or refusal cannot

or will not be remedied by the parent. *Id.*; *see also* 23 Pa.C.S. § 2511(a)(2). The trial court found that "Father's incapacity … was undeniably caused by his alcoholism." Trial Court Opinion, 10/23/2020, at 5. Citing Father's deliberate efforts to maintain his distance from the children while he worked to obtain sobriety, the trial court concluded that Father successfully overcame the cause of his incapacity, and therefore that Appellees failed to prove that termination was appropriate under Section 2511(a)(2). *Id.* at 5-6.

For the sake of completion, the trial court found that Appellees failed to meet their burden under Section 2511(b). It explained that this aspect of the bifurcated analysis requires consideration of whether termination of parental rights would serve the "developmental, physical and emotional needs of the children[.]" *Id.* at 6. Significant to the trial court was the fact that L.A.K referred to Father as "old dad," as this demonstrated, in its view, the existence of a relationship between them. *Id.* It reasoned that nurturing that relationship and cultivating a relationship with Father's family would serve the emotional well-being of the children. *Id.* The trial court found that the revised custody order, which provided for reunification therapy between Father and the children, bolstered this conclusion. *Id.* In the absence of any other evidence on the issue, the trial court concluded that Appellees failed to satisfy the requirements of Section 2511(b).

On appeal to the Superior Court, Appellees argued that the trial court erred in its assessment of all aspects of the Section 2511 inquiry. The Superior Court acknowledged that its standard of review for such challenges requires it to accept the factual findings and credibility determinations of the trial court, to the extent they are supported by evidence of record. *In re Adoption of L.A.K. and A.L.K.*, 2021 WL 1157997, at *6 (Pa. Super. Mar. 26, 2021). If the factual findings are supported by the record, appellate courts

review the lower court's ruling for an error of law or abuse of discretion. *Id.* The Superior Court was also cognizant that

> [a] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*Id.* (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)).

Focusing on Section 2511(a)(1), the Superior Court recognized that to satisfy this provision's requirements, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *Id.* at *8 (quoting *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008)). If such conduct is established, courts must also consider "the parent's explanation for his or her abandonment of the child, in addition to any post-abandonment contact." *Id.* The Superior Court stressed that

> [p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* (quoting *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004)).

Turning to the case before it, the Superior Court agreed with Appellees that Father's failure to maintain contact with the children precluded a finding that he acted with the "good faith interest and effort" required to preserve the parent-child relationship. *Id.* The Superior Court considered the history of the case and concluded that Father's singular effort – the filing of a petition seeking to modify custody – could not overcome the "three-and-a-half years of doing nothing" to preserve his relationship with the children. *Id.* at *11 (citing *B.,N.M.*, 856 A.2d at 885 (providing that courts should avoid applying Section 2511(a)(1)'s six-month provision mechanically and must consider the whole history of the case)). Crucially for our purposes, the Superior Court rejected the trial court's findings that Father's alcoholism and efforts to obtain sobriety presented barriers to his ability to maintain contact with the children and that Father acted with reasonable firmness to overcome these barriers. Citing Mother's testimony that neither her phone number nor her residence changed, as well as the 2016 custody order that provided Father with supervised visitation, the Superior Court concluded that despite having "every opportunity" to maintain contact with his children, Father failed to do so, either in person or by virtue of sending gifts, cards, or phone calls. *Id.* at *12. For these reasons, and without addressing the fact of Father's alcoholism or his efforts to overcome it, the Superior Court found that Appellees had met their burden of proof under Section 2511(a)(1) and that the trial court abused its discretion in concluding otherwise. *Id.*

The Superior Court also agreed with Appellees that Father's extended absence, as well as the very young ages of the children at the time of Father's last contact with them, support a finding that termination of Father's rights would serve the children's needs and welfare as contemplated by Section 2511(b). It faulted the trial court's rationale that

the older child's vague memory of Father provides a basis for maintaining their relationship, explaining that the inquiry under Section 2511(b) is not focused on whether there is any semblance of a relationship, but instead on "whether that relationship is 'necessary and beneficial to the child,' and whether severing that relationship would cause … 'extreme emotional consequences.'" *Id.* at \*16 (citing *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2018)). Because of Father's lack of contact, the Superior Court determined that no necessary and beneficial relationship with either child exists. *Id.* The Superior Court discounted the trial court's finding that cultivating a relationship between the children and Father would serve the children's emotional well-being in the future as not only speculative, but also as contrary to the children's present need for security and stability. *Id.* It did not address the trial court's determination that preserving the relationship with the Father's family was beneficial to the children. Having performed this analysis, the Superior Court concluded that the trial court abused its discretion when it denied Appellees' petitions; accordingly, it reversed the order of the trial court and remanded the case for the entry of an order terminating Father's parental rights to children.

We subsequently granted Father's petition for allowance of appeal to consider the following two issues:

1. Whether the Superior Court improperly substituted its judgment for that of the trial court in contravention of the well-settled standard of review applicable to termination of parental rights cases?

2. Whether the Superior Court erred in concluding that successful efforts to enter into recovery for chronic alcoholism cannot be viewed as overcoming a barrier for purposes of exercising one's parental rights?

*In re Adoption of L.A.K.*, 257 A.3d 1214 (Pa. 2021) (per curiam).

## II.     Arguments of the Parties

Before this Court, Father focuses on the highly deferential nature of the Superior Court's standard of review, which requires it to accept the trial court's factual findings and credibility determinations so long as they are supported by evidence of record. Father's Brief at 13 (citing *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012); *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)). He criticizes the Superior Court for abandoning this requirement in favor of focusing on evidence of record that supports a contrary conclusion. *Id.* at 19. Father stresses that even where there is ample evidence in support of a termination petition and the facts may present a close question of whether the termination petition should be granted, the trial court is in the best position to make credibility determinations and weigh the evidence. *Id.* at 13-14 (citing *In re R.I.S.*, 36 A.3d 567, 572 (Pa. 2011); *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994)).

Father accuses the Superior Court of ignoring the substantial evidence related to the severity of his alcohol addiction, the havoc it caused in his life, and his efforts to achieve and maintain sobriety, all of which supported the trial court's findings that Father overcame a barrier that prevented him from performing parental duties. *Id.* at 14-18. Father points out that that when addressing the trial court's finding that alcoholism created a barrier to Father's ability to perform his parental duties, the Superior Court did not address the evidence of record that supports such a finding, but merely stated that it "cannot agree" before mining the record for evidence to support a contrary conclusion. *Id.* at 18-19. Father reiterates that this Court has held that the trial court is in the best position to make credibility determinations and evaluate the evidence, and that the

Superior Court is not permitted to substitute its judgment for the judgment of the trier of fact. *Id.* at 19.

In support of the trial court's conclusion that Father's alcoholism created a barrier to the performance of his parental duties, Father draws our attention to the definition of alcohol use disorder in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (the "DMS-5"), which encompasses the two previously recognized disorders, alcohol abuse and alcohol dependence. *Id.* at 20-21. Citing various internet-based sources, Father explains that alcohol use disorder can cause physical damage to the brain, that alcohol use disorder makes those that it afflicts susceptible to relapse, and that there is an increased risk for the development of alcohol use disorder in people who begin drinking in their early teenaged years, as Father did. *Id.* at 21. Father emphasizes that a parent's failure to perform parental duties must be considered in light of the circumstances they face and indicates that this medical information should factor into that consideration. *Id.* at 22.

Further supporting his position, Father points to *In re S.S.W.* and *In re Adoption of M.S.,* in which a parent whose parental rights were threatened faced a confluence of difficult circumstances, including physically abusive relationships, mental health problems, criminal charges, and homelessness. In both cases, the parent whose parental rights were threatened took steps to overcome their circumstances. In both cases, the trial courts found that those efforts demonstrated that they acted with reasonable firmness to surmount the barriers that prevented them from parenting their child, and the Superior Courts affirmed both of those determinations. *Id.* at 27-28 (discussing *In re S.S.W.,* 125 A.3d 413 (Pa. Super. 2015); *In re Adoption of M.S.,* 664 A.2d 1370 (Pa. Super. 1995)).

Father emphasizes that he, too, took the necessary steps to overcome his alcoholism,[4] and, as in *S.S.W.* and *M.S.*, the trial court in his case found that his efforts ameliorated his failure to perform his parental duties such that termination of his rights was not warranted. *Id.*[5] Father contrasts the outcomes in *S.S.W.* and *M.S.* with the disposition in his case to underscore his contention that the Superior Court impermissibly departed not only from the confines of its standard of review, but also from the precedent set by these factually similar cases. *Id.* at 28-29.

Appellees reject the notion that the Superior Court impermissibly substituted its judgment for that of the trial court, as "the record can only support one conclusion; termination of Father's parental rights." Appellees' Brief at 9. In that vein, Appellees disagree with Father's assertion that the facts of this case render it a "close call," requiring the appellate court to defer to the trial court's factual findings. *Id.* To the contrary, Appellees argue that the Superior Court properly found that the trial court abused its discretion because the trial court's factual ruling was not supported by the record. *Id.* Appellees agree with Father that once grounds for termination under Section 2511(a)(1) are established, the trial court must consider the parent's explanation for his or her conduct and any post-abandonment contact; however, Appellees point out that Father

---

[4] Although Father states that he suffers from Alcohol Use Disorder, Father's Brief at 29, there is no evidence of record that Father has ever received such a medical diagnosis. Indeed, as Appellees point out in their brief, the materials related to alcohol use disorder that Father referenced in, and appended to, his brief before this Court were discussed for the first time here and are not part of the record in this case. *See* Appellees' Brief at 14.

[5] Father also draws our attention to two non-precedential decisions from the Superior Court that involve a parent struggling with alcoholism, Father's Brief at 23-26 (discussing *In re Adoption of L.G.L.S.*, 1631 WDA 2015, 2016 WL 4661304 (Pa. Super. June 27, 2016) (non-precedential decision); *In re L.M.M.*, 1211 WDA 2013, 2014 WL 10982071 (Pa. Super. Feb. 20, 2014) (non-precedential decision)).

has not had any physical contact with the children since January 2016 although he had a custody order in place permitting visitation, and he has made no attempts to call or send letters, gifts or cards. *Id.* at 10. Mirroring the rationale of the Superior Court, Appellees contend that "[o]ne instance of filing a petition to modify custody … was not sufficient to demonstrate any effort to perform parental duties." *Id.*

Appellees similarly argue that the trial court's determination that Father's efforts to achieve sobriety qualify as overcoming a barrier to the performance of parental duties is unsupported by the record. They point to testimony establishing that Mother's residence and phone number have not changed since she and Father separated and that Father made no attempt to contact the children until more than a year after achieving sobriety. *Id.* at 12-13. It is the year-long lag between achieving sobriety and taking action that Appellees find devastating to the trial court's determination that alcoholism was the barrier that kept Father from the children; Appellees argue that "[e]ven though Father was allegedly sober, he still failed to have any contact with the children or attempt contact with the children." *Id.* at 13. The cases that Father paints as analogous, Appellees find distinguishable. In *S.S.W.*, Appellees contend that the barriers to performing parental duties were protection from abuse and custody orders that prohibited the father from having contact with his child. *Id.* at 15. Appellees emphasize that here, Father not only was not prohibited from seeing the children, but he failed to do so. *Id.*[6] Stressing that the law requires parents to use "all available resources to preserve the parental

---

[6] Similarly, Appellees point out that in both *L.M.M.* and *L.G.L.S.*, the parent facing termination maintained contact with the children at issue either by in-person visits or telephone calls, whereas here, Father made no such efforts at any point before filing a petition to modify the custody order. *Id.* at 14.

relationship[,]" Appellees argue that this record reveals that Father failed to take any action to do so, choosing instead to focus on himself for four years. *Id.* This failure, Appellees contend, vitiates the trial court's finding that Father's fight for sobriety excuses his absence from his children's lives, and therefore that the Superior Court was correct to reverse its ruling. *Id.* at 17.

### III. Analysis

Although set forth as two separate issues, the nature of both questions requires this Court to review the manner in which the Superior Court carried out its appellate review, with particular focus on its handling of the evidence regarding Father's alcoholism and his efforts to achieve and maintain sobriety. Appellate review in cases involving involuntary termination of parental rights is limited to determining whether the trial court's determination is supported by competent evidence. *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard of review, an appellate court must accept the findings of fact and credibility determinations of the trial court if they are supported by evidence of record. *Id.* Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion. *Id.* An abuse of discretion is found where there is a demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. *Id.* at 359 (citing *S.P.*, 47 A.3d at 826). It matters not that an appellate court might have reached a different conclusion, as it is well-established that "absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *Id.* (citing *S.P.*, 47 A.3d at 821; *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994)).

Parents enjoy a fundamental right to make decisions regarding the care, custody and control of their children.  *In re D.C.D.*, 105 A.3d 662, 667 (Pa. 2014); *see also Meyer v. Nebraska*, 262 U.S. 390 (1923).  It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent.  *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 93 (Pa. 1998).  In recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so "clear, direct, weighty[] and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."  *C.M.*, 255 A.3d at 358 (quoting *Charles E.D.M.*, 708 A.2d at 91).

To terminate parental rights under Section 2511(a)(1), the party seeking termination must prove that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties."  23 Pa.C.S. § 2511(a)(1).  "Parental duties" are not defined in the Adoption Act, but our courts long have interpreted parental duties "in relation to the needs of a child[,]" such as "love, protection, guidance and support." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977).  Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship.  *C.M.*, 255 A.3d at 364.  The roster of such positive actions undoubtedly includes communication and association.  *Id.* (citing *In re Adoption of Smith*, 194 A.2d 919, 920 (Pa. 1963)).  The performance of parental duties "requires that a parent exert himself to take and maintain a place of importance in the

child's life." *Id.* (internal citations omitted). Fortitude is required, as a parent must act with "reasonable firmness" to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities. *Id.* Of importance is the General Assembly's emphasis in Section 2511(a)(1) on the six months immediately preceding the filing of the termination petition when evaluating a parent's conduct. Although courts are to avoid the mechanical application of the Adoption Act, we may not ignore that the General Assembly has drawn focus to the six months immediately preceding the filing of the termination petition. Indeed, quite recently this Court addressed this aspect of Section 2511(a)(1) and reaffirmed that for an analysis thereunder, the most critical period for evaluation is the six months immediately preceding the filing of the termination petition. *C.M.*, 255 A.3d at 367.

When considering a request to terminate rights under Section 2511(a)(1), a parent's failure or refusal to perform parental duties "must be analyzed in relation to the particular circumstances of the case." *Burns*, 379 A.2d at 540; *see also Adoption of David C.*, 387 A.2d 804, 807 (Pa. 1978). This Court has explained that:

> [a] finding of abandonment, which has been characterized as "one of the most severe steps the court can take," *Sarver Adoption Case*, [] 281 A.2d 890, 891 ([Pa.] 1971), will not be predicated upon parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control. It may only result when a parent has failed to utilize all available resources to preserve the parental relationship.

*Burns*, 379 A.2d at 540. Decades ago, this Court clarified that "[a] parent's efforts are always considered 'in light of existing circumstances.'" *In re D.J.Y.*, 408 A.2d 1387, 1390 (Pa. 1979) (quoting *David C.*, 387 A.2d at 807). Thus, the focus of the inquiry is on

whether, under the circumstances, the parent has acted with reasonable firmness in refusing to yield to the obstacles that have prevented the performance of parental duties. *In re M.A.K.*, 414 A.2d 1052, 1054 (Pa. 1980); *see also C.M.*, 255 A.3d at 365 (providing that inquiry focuses on whether under the circumstances, the parent has utilized all available resources to preserve the parent-child relationship).

To that end, even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court "must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights]." *In re Orwick's Adoption*, 347 A.2d 677, 680 (Pa. 1975). Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). *C.M.*, 255 A.3d at 365; *Charles E.D.M.*, 708 A.2d at 92; *Atencio*, 650 A.2d at 1066-67. We reiterate that the purpose of this analysis is to give effect to our mandate that courts avoid a mechanical application of the law regarding the termination of parental rights. The law must be applied with the purpose of serving needs and welfare of each individual child in his or her particular circumstances. *C.M.*, 255 A.3d at 364; *In re T.S.M.*, 71 A.3d 251, 268-69 (Pa. 2013). It is within this framework that a court determines whether a parent has faced barriers that prevented the parent from maintaining the parent-child relationship. What constitutes a "barrier" in the context of a Section

2511(a)(1) analysis is a finding within the discretion of the trial court, and what may constitute a barrier necessarily will vary with the circumstances of each case. In some instances, obstructive behavior by the child's custodian presents a barrier to the parent's ability to perform parental duties, which mitigates the parent's failure to maintain the parent-child relationship. *See, e.g., Atencio*, 650 A.2d at 1067; *D.J.Y.*, 408 A.2d at 1389-90. In other instances, trial courts have found substance abuse, mental health issues, homelessness, joblessness, criminal charges, or a confluence of some or all of these issues created barriers to the maintenance of the parent-child relationship. *See In re S.S.W.*, 125 A.3d 413, 417-18 (Pa. Super. 2015). In all instances, the trial court considered the explanation offered by the parent when deciding whether termination of parental rights was warranted.

Termination under Section 2511(a)(1) was at issue in *C.M.* and involved termination proceedings between natural parents, although in that case, the petitioners were the child's mother and the maternal grandparents, who sought to adopt their grandchild. From the time of the child's birth, the child and his mother lived with the maternal grandparents. The father was almost entirely absent from the child's life. For years, the mother rebuffed the father's requests to see the child and eventually stopped answering his calls and instructed him not to contact her. After more than two years, Father filed a custody action. Two months later, the mother and maternal grandparents sought the termination of father's parental rights. The trial court granted the petition, but a divided en banc panel of the Superior Court reversed. On further review, this Court considered, inter alia, whether the evidence was sufficient to permit termination of the father's rights under Section 2511(a)(1). In so doing, we elucidated certain relevant

principles. As previously noted, we clarified that although courts are instructed to consider the history of a case and to avoid a mechanical application of the law, the six months **immediately** preceding the filing of the termination petition is the most critical period of time in which to evaluate the parent's performance of parental duties. *C.M.*, 255 A.3d at 367.[7] We also took the opportunity to explain that a parent's efforts to enforce his or her legal custody rights unquestionably establishes the affirmative performance of a positive parental duty, and that when such action is taken in the face of a custodial parent's efforts to thwart access to the child, the attempts to enforce custodial rights provide evidence that is highly relevant to the question of whether the requirements of Section 2511(a)(1) have been met. *Id.*

The present case is distinguishable from *C.M.* in that Mother did not attempt to dissuade Father from having contact with his children even though she agreed that when he was in the depths of uncontrolled alcoholism, it was best that he had no contact with the children. On the other hand, this case presents certain factual similarities with *C.M.* In *C.M.*, after the mother refused to permit father from having contact with the children, father filed a custody action and attended the court-ordered mediation and conciliation. This Court held that "[i]t is crystal clear, and of vital importance in the present case, that

---

[7] As we explained in *C.M.*, at one time the Adoption Act enabled involuntary termination of parental rights where the parent's "conduct continuing for a period of **at least six months** either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties[,]" and did not indicate when the six-month period was to commence or expire. *C.M.*, 255 A.3d at 366. This provision allowed for a failure to perform parental duties during any six-month period prior to the filing of a termination petition. The General Assembly repealed and replaced that law in the Adoption Act of 1980 and in so doing codified 23 Pa.C.S. § 2511, and in 1992 it amended Section 2511(a)(1) to include the current language ("or a period of at least six months **immediately** preceding the filing of the petition." 23 Pa.C.S. § 2511(a)(1).

a parent's legal efforts to enforce custodial rights demonstrate affirmative performance of a positive parental duty." *Id.* (citing *In re Adoption of Hamilton*, 549 A.2d 1291 (Pa. Super. 1988)). In this regard, we indicated that "despite Father's prior lengthy absence, his proactive participation in the custody court's measured requirements during the time the case was active demonstrates affirmative performance of Father's parental duties to the maximum extent apparent at the time under these circumstances, as well as an interest in and respect for the young child's safety and emotional needs." *Id.* at 368. Accordingly, we concluded that because father continuously exercised parental duties during the two months preceding the filing of the petition, appellants did not meet their burden to establish by clear and convincing evidence he failed or refused to perform parental duties, or a settled purpose of relinquishment, for "a period of at least six months immediately preceding the filing of the petition." *Id.*

In the present case, once Father was confident of his sobriety based upon his own application of the temporal milestones learned from Alcoholics Anonymous principles, Father instituted a legal action at that time to modify the existing custody order so that he could begin to establish a relationship with his children.[8] We emphasize that the trial

---

[8] In *C.M.*, the Court also credited the father with following up on his filing of the custody petition by attending and participating in the mediation and reconciliation proceedings in the two months immediately prior to the filing of the termination petition. *C.M.*, 255 A.3d at 368. But for the swift filing of the termination petition after the commencement of the custody proceeding by Father, this case would be on all fours with *C.M.* in terms of the custody matter. In this case, Father likewise followed up on his custody filing by attending the scheduled custody conciliation, although his participation did not occur during the six-month period immediately prior to the filing of the petitions. At the conciliation session, he obtained an order providing for reunification therapy between Father and the children, although the order further provided that the implementation of the reunification efforts would be stayed until the adjudication of the petitions to terminate Father's parental rights. While these events cannot statutorily be considered, we make note of them to

---

court credited Father for his belief in the validity of this temporal guideline for reference on stable sobriety. As in *C.M.*, this legal action constituted the affirmative performance by Father of a positive parental duty in the crucial six-month period before Appellees filed the termination petitions. Based upon our ruling in *C.M.*, Father must be credited for his assertion of custody rights during the crucial six-month period. Thus, Appellees failed to provide clear and convincing evidence that Father failed or refused to perform parental duties, or demonstrated a settled purpose of relinquishment during the six-month period immediately preceding the filing of the termination petitions.

Moreover, consistent with the above-referenced three-part analysis this Court blessed in *C.M.* to evaluate the totality of the circumstances, the trial court considered Father's explanation for his prolonged absence from the children's lives (his alcoholism and struggle to obtain sobriety), his attempts at post-abandonment contact (filing a petition to modify the custody order), and the effect that termination would have on the children's physical and emotional needs, as contemplated by Section 2511(b) (L.A.K. has a recollection of Father as "old dad," and maintaining a connection with the paternal side of the children's lineage in the long-run serves the children's emotional well-being). *See* Trial Court Opinion, 10/23/2020, at 3-6. Citing this evidence, it concluded that Appellees failed to establish that termination was warranted under Section 2511(a)(1). *Id.* at 6.

Rather than determine whether the trial court's findings of fact were supported by evidence of record, the Superior Court reviewed the record de novo, making its own

demonstrate the impact of the timing of a termination petition on efforts in the custody court.

credibility determinations and findings of fact.[9]  The trial court credited Father's testimony regarding the nature and depth of his substance abuse problem, his motivation for seeking sobriety, the effort he made in conquering his alcoholism, his payment of child support and his efforts to enforce his custodial rights.  This credibility determination formed the basis for the trial court's factual findings; specifically, that in consideration of the totality of the circumstances, Father exercised reasonable firmness in his attempt to overcome the barrier that kept him from performing his parental duties.  *In re M.A.K.*, 414 A.2d at 1054.

Rather than reviewing the record to determine whether there was evidence to support the trial court's findings of fact, the Superior Court searched the record for evidence that would support a contrary conclusion.  With regard to the trial court's determination that Father's alcoholism and journey to sobriety justified his absence from the children's lives, the Superior Court did not assess the record for factual underpinnings for these findings.  Instead, in a vacuum that excluded Father's alcoholism and struggles to achieve sobriety, it emphasized testimony about Father's failure to contact the children or exercise his rights under the March 2016 custody order, which it used as a foundation for its conclusion that Father failed to perform parental duties during the six months preceding the filing of the termination petitions.  The Superior Court acknowledged Father's 2019 petition to modify custody but concluded that this single attempt following "three and a half years of doing nothing does not demonstrate the sort of good faith interest and effort the Adoption Act requires."  *In re Adoption of L.A..K.,* 962 WDA 2020

---

[9]  *See Rebert v. Rebert*, 757 A.2d 981, 984 (Pa. Super. 2000) ("'De novo' review entails, as the term suggests, full consideration of the case anew. The reviewing body is in effect substituted for the prior decision maker and redecides the case.").

at *11. Without explanation, the Superior Court rejected the trial court's determination that Father's efforts to first obtain, and then maintain, sobriety exhibited firmness in the overcoming of an obstacle that interfered with his ability to maintain a parent-child relationship. Once again, rather than examining the record to ascertain whether there was factual support for this conclusion, the Superior Court pointed to evidence that could be cited in support of a contrary conclusion; particularly, testimony that established that Father did not contact Mother or the children, or ever attempt to exercise his custodial rights under the March 2016 order. *Id.*

Crediting the trial court's findings based on the evidence, the record reveals ample support for the trial court's findings that Father suffered from long-term alcohol addiction and that he used all available methods to overcome that obstacle to fulfill his parental obligations. Father testified that he began drinking to the point of blacking out by the age of thirteen. N.T., 7/22/2020, at 67. Father was admitted to a rehabilitation program for alcohol withdrawal symptoms within two weeks prior to his wedding to Mother and twice during the marriage. *Id.* at 68-69. In the summer of 2016, after the parties separated, Father lost his nursing position because of the amount of work he was missing because of serial stays in rehabilitation facilities. *Id.* at 71-72. Since the parties' separation, Father has attended inpatient rehabilitation programs six times. *Id.* He testified that during this period, he "couldn't start drinking without it getting out of control[,]" and that he suffered seizures when he would try to stop. *Id.* at 73. Father lived with Paternal Grandmother, where he "holed up in [his] sister's old bedroom, drinking [himself] to death[,]" until Paternal Grandmother asked him to leave. *Id.* at 79. He also endured periods of homelessness and unemployment, during which he would live in hotel rooms obtained

with money given to him by friends. *Id.* at 79-80. In 2016, Father was charged with driving under the influence and as a result of that, he lost his driver's license until February 2020. *Id.* at 75-76.

Father testified that if not for the children, he would not have had the strength to persist in his quest to obtain sobriety. *Id.* at 74. The trial court found this testimony to be credible. Further, Father indicated that through the years of struggle, the children were "the only thing that kept [him] going" and that the thought of rebuilding his relationship with the children "kept [him] trying." *Id.* Father hit "rock bottom" in October 2018, when he was admitted to a rehabilitation program at UPMC's Presbyterian Hospital. *Id.* at 75, 80. At that time, Father's withdrawal symptoms, including hallucinations, were worse than they had ever been. *Id.* at 80. He realized he had been an alcoholic for all of his adult life, and "the whole reason to get sober" was so that he could see his children again. *Id.* To maintain sobriety, Father participated in over five hundred Alcoholics Anonymous meetings and also attended a similar program, Celebration Recovery. *Id.* at 80-81. At the time of the hearing, Father had stopped attending meetings, although he still used certain aspects of them that he finds to be helpful. *Id.* at 82-84. Father testified that his "recovery is living my life." *Id.* at 82. With particular regard to Father's failure to contact the children between 2016 and 2019, Father testified as follows:

> One of the issues I did have with multiple relapses and recoveries that I've had was trying to take on too much too fast. The whole reason I stayed away from my kids was because I had no business being around them most of the time or even having contact with them. I figured … that it would be more traumatic for them to see me come in and out of their life [sic], so I didn't until -- I had been telling them I've been looking forward to that year of sobriety. I was going to file my paperwork to try and see my children, which I did, whenever I got my year sober.

*Id.* at 87. Father further explained that he got the idea to wait for a year of sobriety from his familiarity with the Alcoholics Anonymous program, as it frequently uses a year of sobriety as a benchmark for resuming various activities, such as dating. *Id.* Father also testified that once he obtained a full year of sobriety, he "was confident enough that [he] could keep it and move forward with seeing [his] children at that point." *Id.* at 87-88. Once he marked a year of sobriety, Father filed his petition seeking to modify the custody order. *Id.* at 94. Mother agreed that it was best for the children that Father was not involved with the children while he was in the depths of his active alcoholism, *id.* at 27-28, and no witness contested the fact that Father had maintained sobriety for the period of time he claimed.

This Court has repeatedly stated that in termination cases involving close calls, deference to the trial court's determination is particularly crucial. *Interest of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving … the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court."); *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) ("[E]ven where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion."); *S.K.L.R.*, 256 A.3d at 1124 ("[T]his abuse-of-discretion standard of

review is crucial in termination proceedings, as appellate courts 'are not in a position to make the close calls based on fact-specific determinations.'") (quoting *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) . This case is a "close call." It is obvious that Father had no contact with his children for a prolonged period of time. The Superior Court discredited Father based on the fact that the children were accessible to him. He knew where they were and he could have triggered the custody proceeding to access them or at least sent cards, made telephone contact or sent presents. The trial court, however, credited his testimony (and Mother's acquiesce in it) that while in the throes of alcoholic behavior resulting in temporary homelessness, loss of his nursing and driver license and joblessness, he was unfit to maintain anything other than a possibly sporadic and potentially destructive relationship with the children. The trial court accepted that in Father's view, his absence from the children's lives was in their best interest.

Most critically, the trial court accepted Father's assessment that based on knowledge he attained by participating in Alcoholics Anonymous, until he reached a year of sobriety, he could not be confident of his commitment to it. And so he waited for that anniversary to file his custody petition. The Superior Court instead concluded that at some point earlier in the year of sobriety, he should have made contact with the children and the filing of the custody petition was too little, too late. After hearing the testimony and assessing credibility, the trial court credited Father.[10] *See Adoption of S.H.*, 383 A.2d

---

[10] As discussed, this case involves a petition for the termination of parental rights filed by one parent against the other. In *C.M.*, we recognized that such a case develops in a fundamentally different manner than a petition for the termination of parental rights filed by a child protective agency. *C.M.*, 255 A.3d at 369. When an agency initiates the action, the children have been in the care of the agency and the parent's ability and willingness to fulfill parental obligations have been documented. When a parent initiates the action,

529, 532 & n.2 (Pa. 1978) (the function of the trial court is to resolve the conflicting testimony of witnesses, and appellate courts may not reweigh the credibility determinations).

We further find it relevant that the trial court recognized the crucial future role of the custody court in its denial of the petition to terminate. Father availed himself of a custody court prior to the filing of this termination petition and therapeutic reunification was ordered. At the termination hearing, Mother and Stepfather expressed the legitimate concern about the impact of Father's reinsertion into their lives on the children and their relationship with them. The trial court wisely recognized that his denial of the termination petition would not catapult Father into the children's lives without necessary acclimation and boundaries. This modified custody order, in the trial court's opinion, bolstered its

there has been no prior external examination of the parent's conduct. This difference is reflected in the nature of the evidence presented at the termination hearing. As we recognized in *C.M.*, a case brought by an agency will have the objective testimony of caseworkers and program providers, in contrast with a case like the one before us where the evidence may consist largely of the subjective testimony of one parent against the other. *Id.* ("Where the interests at stake for each witness are so uniquely fraught, such testimony is qualitatively different from the testimony provided in agency-initiated cases.") Thus, specificity and corroboration are critical for the foundation of competent evidence in cases of termination petitions filed by one parent against another. *Id.*

In this case, Father did not offer expert testimony in support of his own recitation of the effects of his alcoholism on his life or the relationship with his children; his multiple failed rehabilitation efforts or the significance of a year of sobriety in the context of a lifetime of abuse and addiction. Likewise, Appellees did not offer expert testimony to refute Father's evidence in support of overcoming the barrier. However, following the caution expressed in *C.M.*, we observe that Father's testimony was specific and more importantly, critical points were uncontradicted: Father maintained sobriety for a year prior to seeking a modified custody order; the custody petition was filed in the six months immediately preceding the filing of the termination petition; Father maintained his sobriety up to the time of the custody hearing. The remainder of the testimony was subject solely to the trial court's credibility determinations.

conclusion that nurturing the thread of the relationship that Father had with the older child[11] and cultivating the existing relationship with Father's family would serve the emotional well-being of the children. In *C.M.*, we explained the appropriate lens through which to view the stakes at issue in private termination proceedings where the stability and care of children are being provided by the parent seeking termination:

> In further contrast to dependency-related termination cases, which involve the ever-looming threat of harm to a child returned to parents who have already demonstrated an inability to provide proper basic care, there is no evidence or argument in this record suggesting any harm might befall C.M. in the event Father's custody case proceeds, or even that her current home environment and routine would change in any way. Unlike a child in foster care, C.M.'s consequence is not zero-sum; she remains with her known family either way, but only one possible outcome to this litigation includes an opportunity to establish a meaningful relationship with her biological father and siblings.

*C.M.*, 255 A.3d at 370; *see also In re Adoption of Hamilton,* 549 A.2d 1291, 1296 (Pa. Super. 1988) ("We emphasize that there was nothing in the record to suggest that termination of Hamilton's relationship with his daughter was necessary or that it would serve her needs and welfare.").

This evidence supports the trial court's findings that Father struggled with alcoholism and made repeated attempts at obtaining sobriety between 2016 and 2019; that these struggles were the reason Father did not contact the children during that time; that Father's quest for sobriety was driven by his desire to rebuild parental relationships with the children; and that Father distanced himself from the children out of a concern for their best interests. *See* Trial Court Opinion, 10/23/2020, at 5. It was within the trial

---

[11] We note that although the younger child had not articulated a relationship with Father, the blood siblings' future relationships with Father are inextricably intertwined.

court's discretion to credit this testimony and conclude, as a finding of fact that the Superior Court was bound to respect, that in view of the totality of the circumstances, that Father acted with reasonable firmness in overcoming the obstacles that kept him from performing parental duties. *In re M.A.K.*, 414 A.2d at 1054. The trial court concluded that Father's conduct (his failure to maintain the parent-child relationship) was reasonably explained, and in such circumstances, our law provides that parental rights will not be terminated. *Burns*, 379 A.2d at 540. Finding no abuse of discretion in the trial court's ruling that Appellees failed to prove their case under Section 2511(a)(1) by clear and convincing evidence, we conclude that the Superior Court erred in ruling to the contrary.

The Superior Court, based upon its ruling on Section 2511(a)(1), declined to address Appellees' contention that the trial court erred in denying termination of Father's parental rights under Section 2511(a)(2). This case directly impacts the lives of children and their familial relationships and the contours of their future circumstances have been left undetermined for the two-plus years of this litigation. The trial court decided the parental incapacity grounds for termination based essentially on the same facts as it did the parental abandonment claim. As the analysis under Section 2511(a)(2) in this case is straightforward and we feel it unwise to further hold the children's lives in abeyance, we will decide the Section 2511(a)(2) challenge instead of remanding to the Superior Court. Based upon the certified record and the trial court's decision on the issue, we affirm the trial court's decision.

Section 2511(a)(2) provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> \* \* \*

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa. C.S. § 2511(a)(2). *In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012), Pennsylvania courts have developed a three-part test to determine if the requirements of Section 2511(a)(2) have been satisfied: the moving party must prove by clear and convincing evidence that there is (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See, e.g., In re Geiger,* 331 A.2d 172, 173-74 (Pa. 1975) (applying Section 311(2) of the Adoption Act of 1970, the predecessor to Section 2511(a)(2) with identical language); *Matter of M.P.*, 204 A.3d. 976 (Pa. Super. 2019); *In e: N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011).

The trial court found the first requirement to have been satisfied, since as a result of Father's alcoholism, there was continued incapacity by Father to assume his parental duties from at least 2016 until after he achieved sobriety. Trial Court Opinion, 10/23/2020, at 5-6, Father did not contest this finding. Father's Brief in Opposition to Termination of Father's Parental Rights at 17. The trial court did not, however, find that the second or third requirements were satisfied. The children were not without essential parental care, control or subsistence, as they were in the care and control of their Mother (and later Stepfather) during this period. Trial Court Opinion, 10/23/2020, at 6. Moreover, the primary cause of the incapacity was in fact remedied, as Father attained sobriety in or

around October 2018 and maintained sobriety up to the time of the termination hearing in July 2020.[12]  *Id.*

Sufficient evidence of record supports the trial court's findings.  No evidence of record suggests that the children have at any time, while in the care of Mother and Stepfather, been without essential parental care, control or subsistence.  In Appellees' brief filed in the Superior Court, they argued that Father, as a result of his alcoholism, abandoned the children and thus, he failed to provide any essential parental care, control or subsistence.  Appellant's Brief at 25.  Appellees do not argue that because of Father's incapacity, the children were in fact without essential parental care, control and subsistence.  Lastly, while Appellees speculate that Father may not be able to maintain his sobriety over time, pointing to his decision not to seek continued follow up care or treatment for his addiction, *id.* at 26, the certified record contains no evidence that as of the date of the evidentiary hearing before the trial court, that there had been any relapses.  To the contrary, the evidence of record firmly supports that Father has achieved and maintained sobriety and has thus remedied the cause of his incapacity.

For these reasons, sufficient evidence of record supports the trial court's determination that Mother and Stepfather failed to satisfy the statutory requirements under Section 2511(a)(1) or Section 2511(a)(2).

The order of the Superior Court is reversed and the case is remanded to the Superior Court with instructions to reinstate the order of the trial court.

Justices Saylor, Todd, Dougherty and Wecht join the opinion.

---

[12]  At oral argument of this appeal in November 2021, counsel for Father represented that Father remained sober.

Chief Justice Baer files a dissenting opinion in which Justice Mundy joins.